## J. W. STEWART v. CARY LUMBER COMPANY.

(Filed 20 November, 1907).

1. **Railroads—Tramroads as Railroads—Negligence.**

    A railroad operated for the purpose of conveying lumber, though not a carrier of passengers, falls within the ordinary acceptation of a railroad in a suit for personal injury caused by the negligence of the employees of the company in operating its trains.

2. **Railroads — Negligence — Wanton Negligence — Malicious Act of Employee—Damages.**

    While, as a general rule, a master is not answerable in damages for the wanton and malicious act of his servants, when not done in the legitimate prosecution of the master's business, this immunity is not generally extended to railroads whose servants are entrusted with such unusual and extensive means for doing mischief.    The defendant, a corporation operating a train for the purpose of conveying lumber, is liable for the actual damage sustained by plaintiff, caused by the employees on its train wantonly and unnecessarily blowing the engine whistle for the sole purpose of frightening plaintiff's mule, causing the mule to run away and injure plaintiff.

3. **Same—Negligence—Wanton Negligence—Malicious Act of Employee—Damages—Exemplary Damages.**

    When an agent for a railroad company, going out of his line of duty or beyond the scope of his employment, and not in furtherance of his master's business, commits a pure tort on his own account, the master, whether an individual or corporation, cannot, nothing else appearing, be held to respond in exemplary damages. The plaintiff cannot recover exemplary damages of the defendant railroad company arising from an injury received in the running away of his mule, when it appears that the employees on defend-

ant's engine, not acting within the scope of their employment, blew the engine whistle and made other noises for the sole purpose of frightening the mule, when it does not appear that the defendant received benefit therefrom or in any manner acquiesced in or ratified the act.

CLARK, C. J., and CONNOR and HOKE, JJ., concurring; WALKER, J., dissenting.

CIVIL ACTION, tried before *Peebles, J.,* and a jury, at November Term, 1906, of the Superior Court of HARNETT County.

From judgment for plaintiff defendant appealed.

The facts sufficiently appear in the opinion of the Court.

*Stewart & Muse* and *Godwin & Townsend* for plaintiff.

*H. E. Norris, Godwin & Davis* and *D. H. McLean* for defendant.

BROWN, J. The plaintiff's evidence tends to prove that the defendant is operating a railroad for conveying lumber; that on 20 May, 1903, the engineer of one of its log trains, as he was passing near plaintiff, wantonly and unnecessarily blew the whistle of the engine on purpose to frighten plaintiff's mule; that the whistle was blown violently and for some time, and for the sole purpose of frightening the mule; that this blowing did not take place at a crossing and was not done in furtherance of the defendant's business. The evidence tends to prove that the engineer blew the whistle for amusement and to "make the mule dance."

His Honor submitted these issues:

1. Did defendant's engineer, fireman or servants unlawfully and wantonly hollow, make noises and sound the whistle of the engine for the purpose of frightening the horses of the plaintiff, and was the plaintiff injured thereby? Answer: "Yes."

2. What damage, if any, is plaintiff entitled to recover? Answer: "One thousand dollars."

The defendant's counsel contend, through prayers for instruction, first, that it is not liable at all for the wanton tort of its engineer, not done in furtherance of its business and not in the discharge of his duty; second, that it is liable in any event, under the facts of this case, for actual damage only.

1. In considering the first proposition, I regard the defendant, although not a carrier of passengers, as a railroad, within the ordinary acceptation of that term.  *Sawyer v. Lumber Co.,* at this term.  I admit that the entire evidence shows that plaintiff's cause of action grows exclusively out of the wrongful and unnecessary act of the engineer, done wantonly for his own amusement.  I fully agree that the rule obtains generally that a master is not answerable in damages for the wanton and malicious act of his servant when not done in the legitimate prosecution of the master's business, and that the evidence in this case presents a "positive affirmative tort, pure and simple," committed by the engineer without the master's knowledge, approval or ratification.

If we had not held that lumber railroads of the kind operated by defendant are to be governed by the same rule in relation to the public and to employees as steam roads which are common carriers, I should sustain the contention of defendant in this case.  *Hemphill v. Lumber Co.,* 141 N. C., 487; *Bird v. Leather Co.,* 143 N. C., 283.  But this immunity from liability for tort referred to is not generally extended to railroads, whose servants are entrusted with such dangerous instrumentalities and have thereby such unusual and extensive means of doing mischief.  This exception to the general rule seems to be established by most abundant authority and for the reason I have given.

In the well-considered case of *Bittle v. Railroad,* 23 L. R. A., 282, the New Jersey Appellate Court says: "The rule obtains generally that a master is not answerable in damages for the wanton and malicious acts of his servant.  Yet this immunity is not generally extended to railroad corporations,

146—4

whose servants have such extensive means of doing mischief. Accordingly, it has been established that, if their servants, while in charge of the company's engines and machinery and engaged about its business, negligently, wantonly or willfully pervert such agencies, the company must respond in damages, and this is the principle deducible from the authorities upon this subject."

Mr. Jaggard expresses the principle as follows: "The master's duty to third persons may arise from ownership or custody of dangerous things, and it may extend to the conduct of the servant, though forbidden, and for the servant's private purpose and not for the master's benefit." Jaggard on Torts, sec. 88.

It is held by the Circuit Court of Appeals of the United States that the wanton and malicious use of the steam whistle of a locomotive by servants of a railroad company in charge of the locomotive, while in motion on a regular run, renders the company liable for damages on account of injuries caused thereby. *Railroad v. Serville,* 62 Fed. Rep., 730. The Supreme Court of Illinois held the railroad liable in a case where the engineer, while his locomotive was standing near a crossing at the instant a person was passing the track in front of his engine, *negligently or maliciously* caused the steam to escape, whereby the team was made to run off and injure plaintiff. *Railroad v. Harmon,* 47 Ill., 299. This view of the law by which railroads are excepted from the general rule is supported by an array of authority. *Railway v. Harrison,* 47 Ill., 298; *Railway v. Dickson,* 63 Ill., 151; *Ockridge v. Railway,* 90 Ga., 233; *Railway v. Triolett,* 54 Ark., 289; *Cobb v. Railway,* 37 S. C., 194; *Railway v. Starns,* 56 Tenn., 52; *Everett v. Receivers,* 121 N. C., 521; *Brendle v. Railroad,* 125 N. C., 474.

I think the form and wording of the first issue submitted in this case should make no difference whatever in considering the liability of the defendant for some damage. The case

should be considered as if the usual issue as to whether plaintiff was injured by the negligence of defendant had been submitted. I agree with *Judge McCormick,* in *Railroad v. Scoville, supra,* that "We are in danger of refining too much when we attempt to distinguish between a negligent and a wanton or malicious use of the steam whistle of the locomotive engine in charge of the proper servants of the company."

This seems to be the view of this Court in *Foot v. Railroad,* 142 N. C., p. 52, where it is said: "The breach of duty can be, and frequently is, intentional and willful, and yet the act may be negligent." To same effect is *Hayes v. Railroad,* 141 N. C., 197. The wrongful act in this case, in its relation to the engineer, was a wanton tort; in relation to the master it was a mere breach of duty, growing out of the doctrine of negligence, for which motives of public policy require that the master should compensate the plaintiff for the injury sustained.

2. The defendant offered the following prayer, and excepted to the refusal of the Court to give it:

"The plaintiff has offered no evidence tending to show that the defendant authorized or ratified the wrongful act of defendant's agents and servants, and the plaintiff is not entitled to recover any amount as exemplary, punitive or vindictive damages."

I think the Court erred in refusing the prayer and in instructing the jury that they might award punitive damages.

It seems to me that, under all the authorities governing the relation of master and servant, and the liability of the former for the tort of the latter, the defendant is not liable at all for the act of the engineer, except upon the one ground that I have stated. To hold it liable on any other ground is directly against our own recent utterance. *Sawyer v. Railroad,* 142 N. C., p. 5, and cases cited. This ground of liability, it appears to me, does not warrant the imposition of punitive damages in the absence of evidence tending to show either

authorization, ratification or negligence upon the part of its managers in selecting a reckless and improper engineer. How far a principal may be mulcted in punitive damages for the act of his agent is a question about which there is much contrariety and not a little confusion of authority; yet the defendant's contention, upon the facts of this case, appears to me to be supported by most abundant authority, is not in conflict with any of our own decisions, and is founded upon reason and justice. I admit that, where the servants of a corporation engaged in carrying passengers are guilty of acts towards the injured party as a passenger which would subject the servants to exemplary damage, the great weight of authority holds the corporation liable to similar damages, without proof that it ratified or directed the wrongful acts. 3 Sutherland, sec. 950, where all the cases are collected. This is because the corporation can act only through its agents; and when it commits to them the safety and comfort of persons *in transitu* over its road, the authority of the corporation *pro hac vice* is vested in such agents, and "as to such passengers they are the corporation."

Upon this theory a railroad company may be held liable for punitive damages for the insults and rudeness of a conductor to a passenger. *Holmes v. Railroad,* 94 N. C., 318. I admit that, where the agent of the company is acting within the scope of his duty and in furtherance of its business, the company may be held, under certain circumstances, liable for exemplary damages, even though the injured party is not a passenger. Thus, if the agent of the carrier maliciously uses unnecessary force in ejecting a trespasser, it may be a case for punitive damages. Thompson on Negligence (2d Ed.), sec. 3253. Upon this principle this Court allowed such damages against the company for the conduct of its brakeman in ejecting a trespasser from a train with reckless and unwarranted violence. *Hayes v. Railroad,* 141 N. C., 199. In that case this Court said: "It would seem, from the authorities, that,

where the brakeman is acting for the company and within the scope of his agency, the general principles of the law relating to exemplary or punitive damages apply to him as well as the conductor." It was the duty of the brakeman to eject trespassers, and in doing so he represented his master, who was held responsible to the same extent that his servant would be held if he acted maliciously and with unnecessary force. As I read the authorities, the master cannot be *punished* if the servant, in the language of *Lord Kenyon,* "quits sight of the object for which he is employed and, without having in view his master's orders, pursues that which his own malice suggests. He then no longer acts in pursuance of the authority given him." *McManus v. Crickett,* 1 East, 106.

Mr. Sedgwick declares that it is the better opinion that no recovery for exemplary damages can be had against the principal for the tort of the agent, unless done under the *authority* of the principal, or he afterwards approved it, or was grossly negligent in hiring such a servant, or in not preventing him from committing the act. 1 Sedgwick on Damages, sec. 378, and cases cited.

The Encyclopædia, in discussing the liability of corporations for punitive damages, says: "A corporation is liable in exemplary damages for the tortious acts of its agents, if done *within the scope of their authority,* in all cases where natural persons, acting for themselves, guilty of like tortious acts, would be liable to such damages." 12 Am. and Eng., p. 40.

Cyclopædia states, after discussing both sides of the question, that the better opinion is that a principal should not be held liable in exemplary damages unless it be shown that the agent acted within his authority, or that the principal approved the act, participated in it, or was guilty of negligence in selecting his servant. 13 Cyc., 114. In support of his text the author cites a great array of cases from many States of the Union.

Mr. Sutherland, in discussing exemplary damages, sums it up that, where the servant commits a tort in the exercise and scope of his agency, it is deemed, for purposes of compensation, his master's tort, and exemplary damages are allowable. But, says the author, "it is otherwise as to torts which the servant steps aside from or goes beyond his master's employment to commit." "The master is only to be held liable (in exemplary damages) for the act of his servant when the latter is within the scope of his employment."

It has been held by the Supreme Court of the United States and by some twenty or more State Courts of last resort that neither a corporation nor an individual is liable for exemplary damages for the pure torts of employees, although committed while generally on duty, where the act was without authority, not ratified, and diligence was exercised in selecting suitable agents. *Prentice v. Railroad,* 147 U. S., 106. See list of courts and cases so holding, cited in 13 Cyc., 117.

There is no judicial deliverance that I can find, from the original charge of *Chief Justice Pratt* (afterwards *Lord Camden*), quoted by *Justice Gray* in the *Prentice case, supra,* down to the present time, wherein exemplary damages were allowed or justified, other than as a punishment upon the offender. As they are never awarded by way of compensation, but only for punishment of the offender and as a warning to others, they can only be awarded against one who has actually or by legal construction participated in the offense. *Prentice v. Railroad, supra.*

In discussing the facts in the opinion of the Court in the case of the *Amiable Nancy,* 3 Wheaton, 546, *Justice Story* pronounces the transaction a gross and wanton outrage. Nevertheless, in weighing the extent of the liability of the owners, he says: "They are innocent of the demerit of this transaction, having neither directed it nor countenanced it nor participated in it in the slightest degree. Under such circumstances we are of the opinion that they are bound to

. repair all the real injuries and personal wrongs sustained by
. the libellants, but they are not bound to the extent of vindic-
tive damages."

The rule in admiralty as to exemplary damage is the same
as in the common-law courts. *Boston Co. v. Fiske,* 2 Mason,
119-121.

*Chief Justice Martin* expresses the view of the Louisiana
Court with much clearness: "It is true, juries sometimes very
properly give what is called smart money. They are often
warranted in giving vindictive damages as a punishment in-
flicted for outrageous conduct. But this is only justifiable in
an action against the wrongdoer, and not against persons who,
on account of their relation to the offender, are only conse-
quentially liable for his acts, as the principal is responsible
for the acts of his agent." 8 La., 26.

"This rule has same application to corporations as indi-
viduals." *Prentice case, supra.* The true ground for hold-
ing the master liable in exemplary damages is stated very
clearly by *Justice Field* for the Supreme Court of Massachu-
setts: "The logical difficulty of imputing the actual malice or
fraud of an agent to his principal is, perhaps, less when the
principal is a person than when it is a corporation; still, the
foundation of the imputation is not that it is inferred that
the principal actually participated in the malice or fraud,
but that, the act having been done for his benefit by his agent,
acting within the scope of his employment in his business, it
is just that he should be held responsible for it in damages."
*Lathrop v. Adams,* 133 Mass., 471.

I take it now to be generally accepted law that, where the
agent of a corporation commits a wanton and malicious tort
when acting for the master in the scope of the agency and in
furtherance of his master's business, he acts "as and for" the
corporation, and for the time being is the corporation, so
that the criminal intent necessary to warrant the imposi-
tion of exemplary damages is thus brought home to the

corporation.   But where the agent, going out of the line of his duty, beyond the scope of his agency and not in furtherance of his master's business, commits a pure tort on his own account, the master, whether an individual or a corporation, is never to be held in exemplary damages.   There may be cases where, as in this case and that of the *Amiable Nancy,* the master should award just compensation for all real injury sustained, but there are none that I can find ·where, under such circumstances, the master has been made to pay smart money in addition.   If the evidence had disclosed that the engineer, in order to frighten plaintiff's mule, recklessly, wantonly and unnecessarily blew his whistle when approaching a crossing, where it was his duty to blow, then his act would be constructively the corporation's act, and his malice and wantonness could be imputed to it.   But it is admitted there is no such evidence or finding.   The entire evidence shows that it was the pure tort of the servant, committed without the scope of his duty, and not in furtherance of his master's business.   While reasons of public policy may hold the master liable for compensatory damages solely upon the grounds stated heretofore in this opinion, there are no reasons of policy or justice for *punishing* the master for the malicious tort of his servant, which the master could not help, which was not done in the scope of the servant's duty, for which the master derived no benefit, which he did not ratify, and under circumstances when the servant could not be said in any sense to represent or act for him.

For the reasons given, I think there should be a new trial on the issue of damages.

CLARK, C. J., concurring, in part: I concur in the opinion of *Mr. Justice Brown* that, when the whistle is blown, either negligently or willfully, to frighten horses, the corporation is responsible for any damages resulting therefrom.

In *Dunn v. Railroad,* 124 N. C., 257, it is said, citing authorities: " 'Although a railroad company is not liable,

under ordinary circumstances, for the fright of horses, caused by the operation of its road in the usual manner, it is liable for frightening horses and causing injury by unnecessary and excessive whistling or letting off steam under such circumstances as to constitute *negligence or willfulness.'* 3 Elliott Railroad, sec. 1264. 'When a railway company is entitled by law to run its trains along a street, it is not liable for damages caused by the horses of a traveler taking fright at the *necessary* blowing off of steam from one of its locomotives; but if the steam is blown off negligently it would be liable.' 2 Thomp. Neg., sec. 1910. 'Such noises as blowing whistles, sounding large bells or letting off steam, made *without necessity,* when animals are near and likely to be frightened, and when ordinary care would have permitted or dictated a postponement of the noise until the animals were out of hearing, will sustain a verdict of negligence.' 2 Shearman & Redfield Neg., sec. 426."

This same case (*Dunn v. Railroad,* 124 N. C., 258) cites other authorities (for all the authorities are uniform to same effect), among them "the English case of *Railroad v. Fullarton,* 108 C. L. R., 54," in which the company was held liable where the engineer "blew off steam from the mudcocks in front of his engine to frighten horses," citing, also, *Railroad v. Barnett,* 59 Pa. St., 263, where the engineer blew his whistle under a bridge while a traveler was passing over it, whereby his horse took fright, ran off and injured him, the company being held liable.

In *Railroad v. Dickson* (Illinois), 14 Am. Rep., 114, it is held: "If defendant's engineman wantonly and maliciously sounded the locomotive whistle so as to frighten the horses of the plaintiff, whereby he was injured, the company is liable."

In *Billman v. Railroad* (Indiana), 40 Am. Rep., 230, it is held: "If the engineer of a locomotive engine unnecessarily and wantonly sounds the whistle near a highway and thus frightens a team of horses on the highway, causing it to run

away and kill another horse, the company is liable." The Court calls attention to the fact that there was "not merely passive negligence, but willful and wanton wrong."

In *Voak v. Railroad,* 75 N. Y., 320, cited by Wharton Neg., sec. 836, and approved in *Billman v. Railroad, supra,* the following is stated to be the rule of law: "Where the whistle is negligently and wantonly sounded, so that the horses in the vicinity are caused to run off, and injury is inflicted, the company is liable."

In *Railroad v. Scoville* (Texas), 62 Fed., 730, it was held: "The wanton and malicious use of the steam whistle of a locomotive by servants of a railroad company in charge of the locomotive while it is in motion on a regular or authorized run is an act within the scope of their employment so far as to charge the company with liability for injury caused thereby."

In *Culp v. Railroad,* 17 Kan., 475, it is held that, when the whistle or steam is let off carelessly, heedlessly and without necessity, the company is liable for damages caused by a horse being frightened thereby and running off. The opinion is by *Brewer, C. J.,* now on the United States Supreme Court.

In *Bittle v. Railroad,* 55 N. J. L., 615, it is held that, even when approaching a crossing or a station where the whistle is required to be blown, if this is done "negligently, wantonly or maliciously, the company is liable for any damage resulting." This case cites many others (p. 623), among them: "If the whistle is blown in a spirit of wanton playfulness, the company is liable" (*Railroad v. Starnes,* 9 Heisk [Tenn.], 52); or, "if blown louder than necessary or with intent to frighten horses." *Railroad v. Dunn,* 52 Ill., 451; *Hill v. Railroad,* 55 Me., 438.

A railroad is liable for injury caused when a horse is frightened by the negligent or careless blowing of the whistle or escape of steam. *Railroad v. Bœttcher,* 131 Ind., 82. The whole subject of liability of a railroad for damages caused by

willfully and wantonly blowing the whistle is reviewed and reaffirmed in *Alsever v. Railroad* (1902, Iowa), 56 L. R. A., 748, and previously in *Railroad v. Scoville,* 27 L. R. A., 179.

The cases to above effect are numerous and, it is believed, without any to the contrary. Among others in point, but not above cited, are *Railroad v. Harmon,* 47 Ill., 298; *Railroad v. Dickson,* 63 Ill., 151; *Hahn v. Railroad,* 51 Cal., 605; *Andrews v. Railroad,* 77 Iowa, 669; *Cobb v. Railroad,* 37 S. C., 194; *Railroad v. Starnes* (Tenn.), 24 Am. Rep., 296. In 3 Elliott Railroads, p. 1987, in note 3, many cases to above purport are collected, and also in 2 Thompson Neg., secs. 1909-1914 and notes, and notes to Wharton Neg., sec. 836.

The text-books are all to same effect. Besides those already cited, Wood Master and Servant, 539; Cooley Torts, 536; 12 A. and E. (2d Ed.), 31, 40; Wharton Neg., 107, which is cited and approved on this very point; *Myers v. Railroad,* 87 N. C., 350.

I believe no case has been found holding that a railroad is not responsible for damages caused by negligently or willfully and wantonly blowing the whistle, though there are some ancient cases, especially in England, and possibly a few later ones, where the master was held not liable for willful or wanton acts of employees. But Cooley Torts, sec. 536, shows that this reasoning does not now apply to railroads, if it ever did. It would be too unreasonable, for they exercise a public employment, and the public is entitled to protection from the willful, wanton, arrogant or arbitrary conduct of railroad employees, especially when frightening horses along the public road. The employee cannot be identified, and if he were, he usually could not respond in damages. It is the defendant's engine which makes the noise, and the defendant, having put the engineer in charge of it, is responsible, whether he runs the engine willfully over a man or willfully frightens a horse with the whistle. The principle is the same.

It cannot be logically maintained that, while a railroad is responsible for injuries caused by the negligent acts of the servants, there is no such responsibility if the servant acts willfully and wantonly.    Besides the above authorities to the contrary, our own cases are all to the same effect.

In *Cook v. Railroad,* 128 N. C., 333, the flagman and brakeman threw rocks at a tramp stealing a ride under a car, making him get off and causing him to be injured.    The Court held the company responsible, citing *Pierce v. Railroad,* 124 N. C., 84.    Yet, there the brakeman and flagman were not employed to throw rocks, and the tramp was a trespasser.    Here the plaintiff was not a tramp, but a peaceful traveler on the public road, where he had a right to be, and blowing the whistle was one of the duties in the scope of the engineer's employment.    In *Everett v. Receivers,* 121 N. C., 521, where the facts were almost identical with those in this case, the Court charged: "If the engineer wantonly and maliciously made unnecessary noise for the purpose of scaring the horses, and thereby the injury was brought about in the loss of the horses, the defendant would be liable."    On the defendant's appeal the Court affirmed the judgment.    On rehearing (122 N. C., 1010), this ruling was adhered to.

In *Brendle v. Railway,* 125 N. C., 474, which was an action on the same facts for injury to the driver, the Court held that the defendant was "responsible for the willful and wanton injury occasioned by its employees while on duty in its service."

In *Hussey v. Railroad,* 98 N. C., 34, the defendant was held liable for the wanton and willful misconduct of its servant, though the act was *ultra vires,* the Court saying: "It is no defense to legal proceedings in torts that the torts are *ultra vires.    Gruber v. Railroad,* 92 N. C., 1; *Railroad v. Quigley,* 21 How., 202."

In *White v. Railroad,* 115 N. C., 636, the Court said: "It is contended, also, that there is a distinction between the lia-

bility of the master for negligence and that for a willful wrong committed by the servant," and proceeded to show that this contention was unfounded.

In *Waters v. Lumber Co.,* 115 N. C., 652, the Court (*Avery, J.*) says that the principal (defendant company) was "liable for any trespass committed in the course of his employment or the scope of his agency by the person acting for him, to the same extent that he would have been answerable had the wrong been done by him in his own proper person." This, in the case of a corporation, which has no "proper person," means, of course, as fully as if specifically directed to do the wrong by resolution of the governing board. Here the blowing of the whistle was an act both in the course of the engineer's employment and in the scope of his agency. No one else was employed or authorized to blow it. In the recent and unanimous opinion of *Foot v. Railroad,* 142 N. C., 52, the defendant was held liable for the willful and wanton misconduct of its employee, citing *Brendle v. Railroad,* 125. N. C., 474.

It is contended that a railroad is only liable for the acts which the servant is employed to do. When an engineer runs over a man or an animal on the track, which, with due care, he ought to have seen, is he employed by the company to do the act? Certainly the engineer is in the course of his employment in running the engine, and so was the engineer in this case when he willfully and wantonly blew the whistle to frighten the plaintiff's horses. Would the company be absolved from the responsibility because the engineer willfully and wantonly ran over a man or an animal on the track, instead of negligently? Of course, not. 3 Elliott Railroad, p. 1969, and cases cited in note 3. Is the company less responsible because the engineer, in running his engine, uses its steam to injure a peaceable traveler at a distance by sounding his whistle to frighten his horses, instead of using it to willfully crunch and grind the body of a man or an animal on the

STEWART *v.* LUMBER Co.

track? The engineer was not "employed to do" either act, but he did both alike "in the course of his employment."

A locomotive engine is a dangerous, indeed, a deadly, instrumentality. The whistle is a part of the engine. It is dangerous if negligently or improperly used. These engines, crossing public roads and running along them, would be *per se* nuisances, and the use of their whistles, too, but for the overwhelming public necessity. The right to use locomotives, whether on lumber roads or on railroads, is permissible only on condition that competent and careful men are put in charge of them, and that they are not used to the public detriment. If so used, whether negligently or willfully, the company is responsible. What is more calculated than a locomotive whistle to frighten brute or beast? Not the roar of lion, not the horn of Roland at Roncesvalles,

"On Fontarabian echoes borne,"

can shake the nerves and "set the echoes flying" like the shrill shriek of this demon imprisoned in the energies of steam.

The whistle should be blown to give notice and save from danger, not to cause danger. If the whistle is not blown at a public crossing, and one is run over, the company is responsible. *Willis v. Railroad,* 122 N. C., 910; *Norton v. Railroad,* 122 N. C., p. 935, and cases cited. If the engineer, seeing that a rider's horse is frightened, blows the whistle unnecessarily in too shrill a manner, this would be negligence, if it causes any injury which, by due care, could be avoided. For a stronger reason, the company is responsible when the whistle is purposely blown to frighten a horse and causes him to run and injure his driver. *Bittle v. Railroad,* 55 N. J. L., 615. If, by a sudden draft, the engineer negligently throws out sparks which set out fire, the company is responsible. If the engineer purposely turns on the sudden draft in order to set out fire, is it possible that the company is less responsible?

The defendant was allowed to use this dangerous and deadly instrument, running it across and along public roads, but subordinate to the rights of the public.   It put this engineer in charge.   It is responsible for his conduct in discharging that duty when it causes injury to others, whether that misconduct was omission or commission, whether it was willful and wanton or merely negligent.   We cannot divide the engine up and say that the company is responsible for misconduct of the engineer in running over people or in setting out fires, but not for his use of the whistle.   The company was held responsible for not blowing the whistle, whereby (in *Randall v. Railroad,* 104 N. C., 410) the plaintiff's oxen along the county road (not at a crossing) were not turned out and were frightened and killed.   The more is the defendant liable here, when its agent blew the whistle purposely to frighten the plaintiff's horse.

In *Fulp v. Railroad,* 120 N. C., 525, the company was held liable for killing one on the track, though not at the crossing, because by not blowing the whistle at a crossing he had no notice to get off the track.   The cases where the company has been held responsible for the engineer's failure to blow the whistle are numerous, not only at crossings, but along the track, when its use would give people or animals notice.   Can we divide up his duty as to the whistle and say that the company is responsible if he negligently or willfully fails to blow the whistle (*Wilson v. Railroad,* 90 N. C., 69), but not if he negligently or willfully does blow it?   He is not employed negligently "not to blow it"—if that is the test—any more than he is employed to wrongfully blow it.

There is no analogy between the use of the deadly instrumentality of a locomotive engine and the misuse of its dangerous whistle and a farmer sending his wagon to town with a driver and his whip.   Not only are the wagon and whip not dangerous or alarming *per se,* but the wagoner knows he can be promptly identified and arrested, and no public policy

requires the liability of his master to enforce the wagoner's regard for the rights of others.

In *Pierce v. Railroad,* 124 N. C., 94, the point was fully discussed and decided by a unanimous Court, after citation of numerous authorities. It is there said: "The assumption in these prayers that the defendant is not liable if the plaintiff's intestate was killed by the wanton and malicious act of one of the employees of the defendant, and especially if such act was not done in furtherance of the business of the defendant, cannot be sustained. The *true test is, was it done by such employee in the scope of the discharge of duties assigned him by the defendant and while in the discharge of such duties?* 'In furtherance of the business of the employer' means simply in the discharge of the duties of the employment, and the Court below properly told the jury that the defendant is responsible for the injury if caused by the wrongful act of the employee while acting in the scope of his employment. In *Ramsden v. Railroad,* 104 Mass., p. 120, *Gray, J.* (now on the United States Supreme Court), says: 'If the act of the servant is within the general scope of his employment, the master is equally liable, whether the act is willful or merely negligent (*Howe v. Newmarsh,* 22 Allen, 49), or even if contrary to an express order of the master. *Railroad v. Darby,* 14 Cushing, 468.'" After stating above, this Court further proceeded to say (p. 95): "The rule is thus laid down (2 Wood Railways, sec. 316, p. 1404, 2d Ed.): 'Where the act is within the scope of the servant's authority, express or implied, it is immaterial whether the injury resulted from his negligence or from his willfulness and wantonness; nor is it necessary that the master should have known that the act was to be done. It is enough if it is within the scope of the servant's authority.'" The Court, after approving the above quotation, followed with many more authorities to the like purport, and this case (*Pierce v. Railroad*) has been since often quoted with approval on this point, among the instances *Cook v. Rail-*

*road,* 128 N. C., 333; *Lewis v. Railroad,* 132 N. C., 387. In the last case three of the present Court sat with approval.

*Rounds v. Railroad,* 64 N. Y., 129, held: "To make the master liable it is not necessary to show that it expressly authorized the particular act; it is sufficient to show that the servant was acting at the time in the general scope of his authority, and this although he departed from his instructions, abused his authority, was reckless in the performance of his duty, and inflicted unnecessary injury." To same purport *Carter v. Railroad,* 98 Ind., 552; *Lovett v. Railroad,* 91 Mass., 557.

In Clark on Corporations, sec. 208, the authorities are thus clearly summed up: "A corporation is liable for acts done by its officer or agent, apparently in the course of his employment and within the scope of his general authority, though the particular act is unauthorized." This must necessarily be so if corporations are liable for torts of their servants at all, for it is very rarely that servants are "employed to do those acts." Even if it were true that the company is responsible for such torts only when it fails in selecting careful and prudent men, the evidence shows that it did not select careful and prudent agents in selecting this engineer and his crew.

There are circumstances under which it has been held that the corporation would not be liable for mere negligence, but only if the act of its servant was willful or wanton or reckless. *Moore v. Electric Co.,* 136 N. C., 554. But this is the first time it has been contended in this Court that, though the defendant would have been liable if the engineer had negligently frightened plaintiff's horse in the road by blowing the whistle (*Wilson v. Railroad,* 90 N. C., 69), it is not liable if he purposely blows the whistle.

As to this suggested distinction, 2 Sutherland Damages, sec. 410, quotes with approval *Chief Justice Ryan,* in *Craker v. Railroad,* 36 Wis., 673: "It is contended that, though the principal would be liable for negligent failure of the agent to

146—5

fulfill the principal's contract, the principal is not liable for the malicious breach by the agent. As we understand it, that if one hire out his dog to guard sheep against wolves, and the dog sleep while a wolf makes away with a sheep, the owner is liable; but if the dog play wolf and devour the sheep himself, the owner is not liable."

We have not cited any of the numerous cases in this Court where the corporation has been held liable for the wanton and willful misconduct of its employees to passengers, if done in the scope of their employment. The above cited cases are all where the willful and wanton injury was done to others. But it is not perceived why there should be any distinction. If the test is, as contended by defendant, "Was the servant employed to do the act?" it is certain that the railroad agent was not employed to kill the ex-passenger, in *Daniel v. Railroad*, 117 N. C., 592, nor was the conductor employed to kiss the female passenger, in *Strother v. Railroad*, 123 N. C., 197. If the corporation is liable at all for the willful and wanton misconduct of its employees, done in the course of their employment and in the scope of their agency, it cannot affect the liability therefor, whether such misconduct is perpetrated on passengers or the public. As a corporation acts only through agents, it is responsible for the willful and wanton act of an employee in the scope of his agency and in the course of his employment, as fully as if the act were done by its president or other officer, or by their order.

The next proposition is also well settled by the decisions of this Court, that, where the tort is committed, as here, willfully and wantonly, the corporation is liable for exemplary damages. I fully concur in the able and well-considered dissent of *Brother Hoke* on this point. In *Redditt v. Manufacturing Co.*, 124 N. C., 100, it is held that, "When liability is established, and the circumstances are aggravating or malicious, the company is subject to punitive damages, on the same principles that natural persons are." The liability of corpora-

tions in exemplary damages for the wanton or malicious conduct of its employees has been again and too recently held by a unanimous Court, with citation of authorities, to be so soon questioned. *Hutchinson v. Railroad,* 140 N. C., 127.

In 1 Cook Stockholders, sec. 150, p. 69, it is said that, while there are some cases to the contrary, the better rule is that, if injury "has resulted through the willful misconduct of employees, or through such reckless indifference to the rights of others as amounts to an intentional violation of them, punitive or exemplary damages may be awarded," citing numerous cases, among them *Railroad v. Harris,* 122 U. S., 610; *Railroad v. Crews,* 91 U. S., 493.

In 2 Sutherland Damages, sec. 410, it is said, quoting with approval from *Henson v. Railroad,* 62 Me., 84: "Since these ideal existences can neither be hung, imprisoned, whipped nor put in the stocks—since, in fact, no corrective influence can be brought to bear upon them except that of pecuniary loss— it does seem to us that the doctrine of exemplary damages is more beneficial in its application to them than in its application to natural persons. If those who are in the habit of thinking that it is a terrible hardship to punish an innocent corporation for the wickedness of its agents and servants will for a moment reflect upon the absurdity of their own thoughts, this anxiety will be cured. Careful engineers can be selected, who will not run their trains into open draws; and careful baggagemen can be secured, who will not handle and smash trunks and bandboxes, as is now the universal custom; and conductors and brakemen can be had who will not assault and insult passengers; and if the courts will only let the verdicts of upright and intelligent juries alone, and let the doctrine of exemplary damages have its legitimate influence, these great and growing evils will be very much lessened, if not entirely cured. There is but one vulnerable point about these ideal existences called corporations, and that is the pocket of the moneyed power that is concealed behind them, and if that is

reached they will wince.    When it is thoroughly understood that it is not profitable to employ careless and indifferent agents or reckless and insolvent servants, better men will take their places, and not before."

In the next section (411) *Judge Sutherland* gives a long list of States and decisions establishing "the views of the liability of corporations to punitory damages" for the misconduct of employees.

In Clark on Corporations, sec. 69, p. 197, it is said, citing authorities: "A corporation may not only be held liable for actual damages resulting from a malicious wrong, but it may also, by the weight of authority, be held liable for exemplary damages, where, under similar circumstances, a natural person would be held so liable.    A corporation is liable for the acts of its servants and agents, including their wrongful acts, on the same principles."

In *Jackson v. Tel. Co.,* 139 N. C., 347, it was held that the master must answer for the servant's wrongful act, "if committed in the course and scope of the servant's employment," and that he is in the course of his employment "when he is engaged in that which he is employed to do, and is at the time about his master's business," citing numerous authorities.    And that case also holds that, where the act was wantonly done, the plaintiff can recover exemplary damages, citing *Railroad v. Prentiss,* 147 U. S., 106 ; *Railroad v. Arms,* 91 U. S., 489 ; *Hansley v. Railroad,* 117 N. C., 565.    To same effect *Foot v. Railroad,* 142 N. C., 52 ; *Hutchinson v. Railroad,* 140 N. C., 127.

In *Daniel v. Railroad,* 136 N. C., 527, *Walker, J.,* says: "If the servant, instead of doing that which he is employed to do, does something else which he is not employed to do at all, the master cannot be said to do it by his servant, and, therefore, is not responsible for what he does.    It must be something done in attempting to do what the master has employed the servant to do.    Nor does the question of liability

depend on the quality of the act, but rather upon the other question, whether it has been performed in the line of duty and within the scope of the authority conferred by the master." Here the servant was doing what he was employed to do—running this engine—and was not doing "something else which he was not employed to do at all." In discharging that work, and "incident to the furtherance of the duties entrusted to him by the master" (*Roberts v. Railroad,* 143 N. C., 176), it was for him to blow the whistle. If he negligently blew it, or failed to blow it, and caused injury, the master is liable, and equally so if the misconduct in blowing or failing to blow the whistle was wantonly done, as here, and was not merely negligent. That it was an act of commission, not of omission, does not relieve the master who put the engine in the servant's charge, for the wanton act was done in operating the engine and in the course of the employment.

Whenever the facts are such that the rule of *respondeat superior* will make the master responsible in damages for the servant's negligence, it will make the master responsible for exemplary damages if there was wantonness, insult or oppression, as where the train ran by a station without stopping to take on a passenger (*Walker, J., Williams v. Railroad,* at last term, 144 N. C., 503, and cases there cited; *Thomas v. Railroad,* 122 N. C., 1005; *Hansley v. Railroad,* 117 N. C., 565; *Purcell v. Railroad,* 108 N. C., 414; *Milwaukee v. Arms,* 91 U. S., 489; 2 Sutherland Dam., sec. 937), or where a passenger is wrongfully put off the train under circumstances showing indifference to consequences, or rudeness (*Rose v. Railroad,* 106 N. C., 168), or false imprisonment (*Lovick v. Railroad,* 129 N. C., 437), and similar cases. If the corporation here was liable for damages for injury caused by the negligence of the engineer, the Judge was right in charging that, if the engineer's conduct was wanton and willful, the master was liable for exemplary damages. This is already so held. *Purcell v. Railroad,* 108 N. C., 418.

The rule is thus stated in both the Encyclopædias, with copious citation of authorities: The master is "liable in exemplary damages for any act of his agent or servant committed in the course of or in connection with his duties or employment; and this irrespective of whether the particular act has or has not been expressly authorized or subsequently ratified by the principal or master. If the tortious act of the agent or servant, when committed in the business of his principal or master, is such as would have subjected the agent to exemplary damages had he been sued as principal, the principal will be responsible for like damages when sued for the misconduct of the agent; or, as it has been otherwise expressed, the principal or master is in such cases liable precisely as if he were the original wrongdoer." 12 A. and E. (2d Ed.), 32, 33. The employment of the agent "afforded him the means and opportunity which he used while so employed in committing the willful wrong. The agent's conduct, therefore, is attributable to the principal, though he may not have specially authorized the particular act or afterwards ratified it." *Ib.,* 33. "The general rule is that these artificial bodies are liable in the same manner and to the same extent that * * * natural persons, acting for themselves, guilty of like tortious acts, would be liable to such damages. In some cases the rule of punitive damages has been held especially applicable and salutary in its operation as affecting corporations." *Ib.,* 40, 41.

"The better rule seems to be that, where a wrong is committed in the ordinary course of the servant's duty, and is committed willfully, the corporation can be held liable as in ordinary cases of tort. Since a corporation can only act through its agents or servants, a stricter rule has sometimes been applied than in cases of individual liability, and they have been held liable in exemplary damages, although there was no previous authorization of the wrong nor subsequent ratification of it." 13 Cyc., 117.

The great majority of the vast army of men engaged in running locomotives and trains for common carriers or for lumber companies and street railways are good men, but necessarily there are always some who are not. It is to the interest of the good men thus employed, and an absolute necessity to the public, that there shall be some rigid restraint to prevent injury, insolence and arrogance towards the public being perpetrated by those who "have no fear but of human law." With the almost insuperable difficulty of identifying men engaged on moving trains, the only possible regulation is by their officers, who can readily hunt the guilty out. This protection cannot be secured unless the corporations themselves are liable, as heretofore, in punitive damages for willful and wanton wrongs inflicted upon the public, as well as on passengers, by any employee of such corporations, "when on duty" or, as our decisions say, "in the course of their employment."

In so vast a number of decisions as has been poured out by the numerous courts of this country and in England, some can be found, by a little diligence, on either side of almost any question. There are, it is true, some few decisions in a few courts contrary to those above cited. These are almost solely those whose views on this question were expressed at an early day, before this matter was thoroughly discussed (see 1 Cooley Torts, p. 199) and before the absolute necessity was fully comprehended of protecting the public against insult and wrong from irresponsible employees, who could not be identified, and before it was fully seen that the only possible way to insure this protection to the public is by punitive damages against the corporation, to be assessed by juries, who, in fixing the amount, will consider the greater or less care shown by the corporation in selecting their servants and in supervising their conduct. There may, indeed, be a few courts whose expressions on this subject should be entitled to small weight for other reasons. We cannot particularize and weigh each case. These decisions of our own Court should rather

be followed, and not be lightly set aside for those of any other court, when our own decisions have been uniform and are based on sound reasons and the absolute necessity of giving adequate protection to the public, and, besides, are supported by the great weight of authority elsewhere, as above shown.

The facts as found by the jury on the conflict of evidence present an aggravated case of wanton wrong. An old man, accompanied by two lady relatives, peacefully traveling along the public road, at a place where he could not turn out, has his horses wantonly frightened by those in operation of the defendant's engine and cars, that they may have the pleasure of seeing his horses "jump about" and enjoy his terror and fright. It is peculiarly a case permitting exemplary damages—if the jury should think proper—that the people living in the country may know that they can travel along their public highways without fear of exposing their lives and limbs to such wantonness.

If a corporation is liable for injuries caused to travelers along the public road by the negligence of its servants, but exempt if their acts are willful and wanton, it can always escape liability by thus aggravating the nature of the wrong inflicted. The misconduct of the engineer and other employees was wanton and willful and committed "while on duty, in the course of their employment and in the scope of their agency" in operating the defendant's engine and train of cars. There was no evidence of contributory negligence, and that phase of the case is immaterial to be considered.

It is true that this is not a public service corporation, but the same principle against wanton frightening of the plaintiff's horses would apply if the wrongdoer had been operating a railroad locomotive or was the chauffeur of an automobile. The public is entitled to use its public roads with its horses without fear of such wanton wrongs being inflicted upon it in the use of the superior power of steam, and that willful wrongdoers shall be restrained by the fear of exemplary damages against themselves or their master for such misconduct.

HOKE, J., concurring, in part: I differ from the Court in its decision on the question of damages, and am of the opinion that no error appears affecting the determination of either of the issues submitted, and that the judgment on the verdict should be affirmed as rendered.

The evidence of plaintiff tends to show that he was driving in a buggy along a public highway which ran parallel to defendant's tramroad at a point where there was thirty feet space between the railroad and a fence, which also ran parallel to both roads, and where he was not able to get out of the way with the vehicle after seeing defendant's engine and cars approaching; that plaintiff's sister and niece were just behind him, in another buggy, and when the train came in sight they all got out, and plaintiff led the horse drawing the rear buggy up by his own, and was holding both animals at their heads; that when the engine and cars came within seventy-five yards of plaintiff, and where he was in full view, the engineer, or an employee on the engine, commenced blowing short, sharp, piercing blows with the engine whistle, and the hands commenced to halloo and cry out at plaintiff, and continued this conduct until the train was seventy-five yards beyond plaintiff, causing his horses to take fright and, by their action, do him severe bodily injuries.

The plaintiff charges that this conduct was done unnecessarily and wantonly and with intent to frighten the horses, and that, in consequence of the shrieks and piercing sounds from the engine, and the shouts, yells, etc., of the crew, the horses did become badly frightened, demoralized and unmanageable, causing the serious injuries, as stated.

The sister and niece of plaintiff gave substantially the same testimony. There was also evidence to the effect that Troy Monds, the engineer, was heard to say that he blew the whistle "to see the horses jump about." There was evidence on the part of defendant denying these allegations and affirming that the whistle was only sounded as required by the rules of the

company as the train approached a crossing at or near this place, and that no whistle was blown to frighten anyone's stock.

The issues submitted were as follows:

"1. Did defendant's engineer, fireman or servants unlawfully and wantonly halloo, make noises and sound the whistle of the engine for the purpose of frightening the horses of the plaintiff, and was the plaintiff injured thereby?" Answer: "Yes."

"2. What damage, if any, is plaintiff entitled to recover?" Answer: "One thousand dollars."

Under the charge the jury answered the first issue "Yes" and the second issue "One thousand dollars."

It is assigned for error in the determination of the first issue: "That, on the facts presented, the Judge below should have held that the defendant was not liable."

These facts tend to show that plaintiff was on the public highway, where he had a right to be, and doing all he could to shield himself, and has suffered a grievous injury from the employees of defendant company while operating its engine and train in the course of the company's business; and if the position of defendant can be maintained, plaintiff is left without any means of substantial redress, for we know that, as a rule, the employees individually are not pecuniarily responsible. A decision which works this untoward result calls for most careful scrutiny, and, to my mind, is based neither upon right reason nor well-considered authority. As I understand it, the contention proceeds upon the theory (1) that, by his allegation and testimony, the plaintiff is confined to a recovery for a willful and malicious tort; (2) that, on the entire evidence, no case for such a recovery is made out. I do not think that either position should prevail. Treating them in reverse order, there is no need to combat the proposition urged upon our attention with such fullness of learning, that to hold a corporation or other employer responsible for the malicious

torts of its agents or employees, the wrong must, as a general rule, be one committed by authority of the employer, either expressly conferred or fairly implied from the nature of the employment or the duties incident to it.

This was announced as correct doctrine by this Court in *Sawyer's case,* 142 N. C., 1, but with this important and essential modification, "that the test suggested applies only when the question of fixing responsibility depends exclusively on the relationship of master and servant," and does not apply when the wrong complained of is a violation of some duty which the master owes directly to the injured person.    Nor is there any question made of the principle so well announced and sustained in *Jackson's case,* 139 N. C., 347: "That authority for the wrong on the part of an employee will be implied and responsibility imputed when the wrong is done in the scope and course of the servant's employment."    And further: "That a servant is acting in the course of his employment when he is engaged in that which he was employed to do, and is at the time about his master's business.    He is not acting in the course of his employment when he is engaged in some pursuit of his own."    Mr. Jaggard, in his work on torts, suggests that the term "course of employment" is the better term in these cases, as both most accurate and comprehensive.

It may be that, under the principles maintained in both of these cases, responsibility for the wrong could well be imputed here to the defendant company, because done in the course of its employment; for, as said in Tiffany on Agency, p. 270, quoted with approval in *Jackson's case, supra,* "A servant is acting in the course of his employment when he is engaged in that which he was employed to do, and is at the time about his master's business.    But he is not acting in the course of his employment if he is engaged in some pursuit of his own.    Not every deviation from the strict execution of his duty is such an interruption of the course of employment as to suspend the

master's responsibility, but if there is a total departure from the course of the master's business the master is no longer responsible for the servant's conduct.

But there is an additional principle present in the case we are now considering, which is, to my mind, controlling, and which the argument on the part of the defendant seems to entirely ignore, and that is, when the master or employer owns and operates in his business dangerous instrumentalities, and authorizes their use in places where harm to others is likely to arise, unless a very high degree of care is shown, the employer in such case must be held to responsibility for injuries wrongfully caused by such agencies while engaged in his work, whether the injury was brought about by the negligent or intentional misconduct of his employees. Whether this occasion for responsibility should be referred to a breach of an independent duty owing direct from the owner to the injured party, being the limitation on the general doctrine we are considering, suggested in *Sawyer's case, supra,* or whether it arises because, the danger being great, public policy requires that the corporation and employer shall be held to insure this careful handling, so far as the general public is concerned—which seems to me only a different way of stating the same doctrine—the principle is well grounded in reason and is fully sustained by authority.

It is stated by Mr. Jaggard, in his work on torts, as follows:

"Sec. 86. The master is liable for the conduct of his servant, within the course of his employment, not only (*a*) where responsibility would attach under the test of scope of his employment, but also (*b*) where the conduct is not intended to be for the master's benefit, but for the servant's malicious, capricious or other private purpose, and (*c*) whenever a duty rests on the master to avoid doing harm to the third persons and the servant violates that duty in the course of his employment.

"Sec. 87. The duty owed by the master to third persons may arise from contractual or conventional relationship of the master to the person seeking to charge him for his servant's wrong, especially where the master's premises, instrumentalities and facilities of business made the harm possible, or where the master will be held estopped to deny liability.

"Sec. 88. The master's duty to third persons may arise from ownership or custody of dangerous things, and it may extend to (*a*) the conduct of the servant, though forbidden, and for the servant's private purpose and not for the master's benefit."

Pursuing this last statement, the author says: "When the master owns, uses or controls such instrumentalities, he is bound to perform that duty, and he cannot escape it by the exercise of care in the selection of his servants. Therefore, the master was held liable for the forbidden act of his employees, who frightened horses by blowing steam from an engine of which they had full charge." And the statement of the doctrine is supported by a large number of well-considered decisions in this and other jurisdictions. *Railway v. Scovell,* 62 Fed., 730; *Railway v. Harrison,* 47 Ill., 298; *Railway v. Dickson,* 63 Ill., 151; *Ackridge v. Railway,* 90 Ga., 232; *Railway v. Triplett,* 54 Ark., 289; *Bittle v. Camden,* 55 N. J. Law, 615; *Cobb v. Railway,* 37 S. C., 194; *Railway v. Starnes,* 56 Tenn., 52. And recovery on this principle has been sustained in direct decisions of our own Court, in *Everett's case,* 121 N. C., 519; *Brendle's case,* 125 N. C., 474; *Foot's case,* 142 N. C., 52. This last case is in all of its essential features like the one before us, except in that case the implement was a hand car operated on the defendant's road—a difference which makes in favor of the present recovery, if any weight is to be attached to it.

In *Foot's case* the evidence is not set out in full, but an examination of the record shows that the plaintiff was in a buggy, driving on a highway, and was injured by loud cries

and noises made by defendant's employees while operating a
hand car of the company, and done with the intent to frighten
the horses.    A recovery was sustained.

In *Bittle's case, supra,* cited in 9 Am. Corp. and Ry. Cases,
472, because, no doubt, considered especially instructive, the
plaintiff had been nonsuited by the lower Court and the non-
suit was set aside and a *venire de novo* awarded, and the case
is very similar to the one we are considering.    There the
plaintiff was holding his horse on a highway which ran par-
allel to defendant's road, and the horse was frightened by
blowing the whistle of the engine.    It was claimed by plain-
tiff that this blowing was an unnecessary, wrongful and will-
ful act on the part of the engineer.    The evidence on the part
of the plaintiff as to blowing the whistle was as follows: "I
did not think of him blowing the whistle there, because he
was just beyond the crossing when he blew the whistle, and
he was looking, with his head out of the cab window, and saw
me, and he was smiling, and he just reached up and pulled
the whistle, as I call it, wide open, and the instant he did that
the horse jumped.    As soon as he saw me he reached right up
and pulled the whistle."    The witness never heard a shriller
whistle in his life; it was a great deal louder than usual, and
was so blown for 200 yards; that it did not blow until it was
beyond the crossing, opposite the point where the plaintiff was,
with a horse and wagon, and the whistle has never been since
blown at that point; and at the time it was so blown in this
manner there was nothing on the track ahead to provoke such
a whistle.    It was held that, on the plaintiff's claim, he had a
cause of action to be presented to a jury, and in laying down
the principle the Court said: "The rule obtains generally that
a master is not responsible in damages for the wanton and
malicious acts of his servant, yet this immunity is not gener-
ally extended to railroad corporations, whose servants are
entrusted with such extensive means to do mischief.    Accord-
ingly, it has been established that, if such servants, while in

charge of the company's engines and machinery and engaged about its business, negligently, wantonly and willfully perverted such agencies, the company was responsible in damages; and this is the principle deducible from the authorities upon this subject."

In *Railway v. Dickson, supra,* it is held that, "Where the servants of a railway company, while in the discharge of their duties, pervert the appliances of the company to wanton and malicious purposes, to the injury of others, the company is liable for such injuries."

In *Railway v. Harrison, supra,* the Court, in upholding the principle, not inaptly said: "The life and property of individuals cannot be lightly or wantonly placed in jeopardy. If that might be done, then these great instruments of prosperity and agents in the development of the resources of the country and promoters of its commerce, instead of a blessing, would become a nuisance, if not a curse, to our citizens. If the lives of men and their property must be endangered in the pursuit of their ordinary and legitimate business while lawfully passing over our public highways, and no person can be held responsible, then it has become an injury instead of a blessing that they were constructed." Again, "The appellee had the undoubted right to travel this public highway, and the appellants had no right, by their agents, to unnecessarily hinder him or his property while thus exercising his right. Both parties have the right to pass and repass over the roads in the modes adapted to their construction, and each is under equal and reciprocal obligation to observe the rights of the other; and neither can willfully, wantonly or negligently endanger, obstruct or delay the other in the enjoyment of his rights, without incurring liability for the injury, and each party, in the exercise of his rights, must observe the highest degree of prudence, circumspection and skill to avoid the infliction of injury." And further, "It can make no difference whether the escape of steam was negligently permitted or willfully

done by the engineer, any more than if he had willfully run his engine against the appellee's wagon and team and thus produced the injury.    The question whether it was negligently or intentionally done can, we think, make no difference in the result."

These authorities, and the principle on which they rest, are, in my opinion, decisive of the question, and show that, on the facts disclosed, the defendant is responsible for the misconduct of its employees while operating the engine, whether the demand be asserted as for a malicious or negligent tort.    And it is in ignoring this important and wholesome principle of imputed authority that the error of defendant's position consists (6).    It is in this respect entirely unlike the case of an owner sending his wagon to town by a driver, as suggested in (7); and the further suggestion that the engine whistle is no part of its necessary or operating machinery is not a pertinent or permissible view of the question.    The engine may be dangerous to persons on the train by reason of its operating machinery, but to persons on the highway the engine and its sounds are the chiefest elements of danger.    The whistle is put on the engine for the purpose of warning, and is desirable chiefly by reason of the startling sounds it may make; and, where the injury has occurred to one on a highway, to suggest that the whistle is no part of the structural or operating part of the engine's machinery, and to make deductions from it prejudicial to the plaintiff, is to assume out of the case the controlling and certainly the most important element.

In nearly every authority cited and relied upon as upholding a contrary view—certainly (8) in those I have examined—it will be found either that the implement used was not one that essentially imported danger to outsiders, or the act complained of was not done while operating or using the instruments in the course of the employee's business.    Thus, in *Smith v. Railway,* 73 Hun., 524, the "torpedo case," the

agent was acting entirely outside of the course of employ-
ment; and so in similar cases suggested and relied on by coun-
sel, as if an engineer should shoot another from the cab, or
intentionally strike another with a piece of coal or wood.
None of these acts are within the course of employment.
They could be likened to the case of *Roberts v. Railroad,* 143
N. C., 176, where two employees had a fight, and it was held
that the mere fact that the fight occurred while they were both
on duty did not import responsibility of their common em-
ployer for injury inflicted by one upon the other. And, in
*Evers v. Krouse,* 70 N. J. Law, 653, the hose used by the
little boy did not import an injury threatened or reasonably
contemplated to one who was going along the street, and the
father was, therefore, excused.

Of the cases cited by the Court, which I have examined, the
only one which tends to uphold the decision upon the facts of
the present case is that of *Stevenson v. Pacific Railway,* from
California. This case may possibly be distinguished on the
ground of the defense suggested, that the engineer was not at
the time running the engine for the company, but intentionally
moved it for the purpose of frightening the passengers, and
so did not do the wrong while operating the engine in the
course of defendant's service. The case is published in 15
L. R. A., 475, with the comment by the editor that it possibly
ignores the principle of responsibility in the use of a danger-
ous agency, and, to the extent that it does this, I think the
case is clearly against the almost uniform current of authority.

I have thus far endeavored to show that the defendant com-
pany, on the facts of this case, is responsible for the wrongs
of its employees, whether redress is sought for a malicious or
a negligent tort. But I think the other proposition asserted
in behalf of defendant is equally untenable—that, on the facts
and testimony, the plaintiff is confined to recovery as for a
malicious or willful tort—predicating such a position on some
former decision of this Court (12 N. C., 185), in which it

was held that, for an injury wrongfully caused by beating a drum and thereby causing a plaintiff's horse to run away, the action should be in trespass and not in case—this last being the technical term for actions of negligence.

The position seems to admit that recovery could be had if redress had been sought for negligence, but holds that relief should be denied because of the allegation and evidence to the effect that the noises were willfully and wantonly made. It would roll back our procedure to perplexing subtleties of a bygone time to deny relief on any such ground as this. *Judge Gaston,* in speaking of these actions—trespass and case—in *Dodson v. Mock,* 20 N. C., 282, said: "The distinction between injuries which are the proper subject of an action of trespass and those which are to be redressed by an action on the case, between injuries immediate and those which are consequential, is sometimes very subtle and attenuated." It was largely on account of just such distinctions that our Legislature felt called on to interfere and establish our present beneficent method of procedure. The change had for its basic principle an abolition of these very distinctions. In section 354 of the Revisal it is said: "The distinction between actions at law and suits in equity and the form of all such actions and suits are abolished, and there shall hereafter be but one form of action for the enforcement or protection of private rights and the redress of private wrongs." Carrying out the idea in section 467: "The complaint shall contain a plain and concise statement of the facts constituting a cause of action." Construing this legislation, the Court has, by numerous and well-considered decisions, established that the plaintiff now recovers on facts, and is entitled to any relief to which the facts alleged and proved show him to be entitled. *Hendon v. Railroad,* 127 N. C., 111. And if these facts which are fully set out show that the plaintiff is entitled to recovery for a negligent wrong, he should not be barred of relief because he has gone farther than the case required and stated his cause as for a willful injury.

It is urged, however, that plaintiff cannot maintain this last position because the issue shows that the cause has been determined on the theory of a willful wrong, and that if only recovery for negligence is allowable, the verdict should be set aside.

There is doubt if the allegation and issue make out more than a claim for a negligent wrong. It is not stated or found that the employees of defendant intended to harm or injure the plaintiff, but that they intended to frighten the horses, whereby the damage was caused. As we have held, in *Foot v. Railroad, supra,* it is only where the *injury* was willful that the idea of negligence is necessarily eliminated. Negligence is there defined to be a breach of duty, causing unintended damage. "The breach of duty can be willful and the action can still be maintained for negligence if the harm was not intended." The allegation, evidence and issue establish that the breach of duty was intentional, but not the injury done. But, assuming that the recovery was had for a willful wrong, when it should have been for negligence, the results of the trial should not be disturbed unless this difference has wrought in some way to the defendant's prejudice. *Cherry v. Canal Co.,* 140 N. C., 422, where it is said, quoting from *Ashe, J.,* in *Butts v. Screws:* "A new trial will not be granted when the action of the trial Judge could by no probability injure the appellant." In this aspect of the case it is urged that no issue of contributory negligence was submitted, and that this defense would have been open to the defendant in an action for negligence. There was, however, no evidence tending to show contributory negligence. All of the witnesses on both sides seem to have been examined, and, in the entire absence of any evidence tending to sustain it, the error in declining to submit an issue as to contributory negligence was harmless.

Again, it is submitted that the jury were allowed to give punitive or exemplary damages. But the jury have found that the wrongful act of the defendant's employees was unlaw-

ful and wanton and done for the purpose of frightening the plaintiff's horses, whereby the injury was caused.        While there are some decisions to the contrary, the great weight of authority is to the effect that in such case a corporation may be held responsible in exemplary damages for the torts of its agents under such circumstances, whether the demand be asserted for a malicious or a negligent wrong.        Hale on Damages, 218; Joyce on Damages, sec. 139; Sutherland on Damages, sec. 410; Sedgwick on Damages, sec. 380; *Railway v. Steem,* 42 Ark., 321; *Illinois Co. v. Seed,* 115 Ala., 670; *Goddard v. Railway,* 57 Me., 202; *Hanson v. Railroad,* 62 Me., 84; *Baltimore v. Blocker,* 27 Md., 277; *Traction Co. v. Orban,* 119 Pa., 37.        In our State the doctrine is firmly established.        *Hutchison v. Railway,* 140 N. C., 123, and numerous decisions of this Court to same effect could be cited.

In Sedgwick, *supra,* it is said: "I find it is held in many, perhaps most, jurisdictions that a corporation is liable to exemplary damages, if to any, for an act of its servant which would subject the servant to exemplary damages."        In Hale, *supra,* quoting from decisions of high authority, it is said: "It is usually held that corporations are liable for exemplary damages for the acts of their agents or servants in cases where the agent or servant would be liable for such damages.        This is placed on the ground that otherwise corporations would never be liable for exemplary damages, since they can act only by agents or servants."        If this is the correct principle, then punitive damage could be awarded, whether the action be considered one for a malicious or negligent tort.

There was, therefore, no harm done to the defendant in trying the cause on the issue submitted, and I am of opinion that the verdict and judgment should not be disturbed.

The facts show that the plaintiff, on the public highway, where he had a right to be, and doing all he could to save himself, has been subjected to an outrageous wrong, causing serious bodily injuries, by the misconduct of the defendant's em-

ployees operating an engine in the defendant's service on its tramroad; and, when called on to answer, the defendant's reply is: "Yes; I sent out the engine, an instrument essentially dangerous and not unlikely to frighten your horses, and my employees, by their misconduct in operating my engine, in the course of my employment, did you a grievous wrong, but I should not be held responsible, because, in sounding the whistle, my engineer was not then acting in the course of my business, but was only doing it for his own diversion and to see the horses jump."

But for the sanction given it by my brethren, for whose learning and ability I have the greatest respect, I should say that such an answer is not deserving of serious consideration, and that the plaintiff, on the allegations, evidence and the issues as they now stand, should be allowed to recover either for a negligent or a malicious tort; and the Judge below made a correct ruling in allowing the jury to award punitive as well as compensatory damages.

CONNOR, J., dissenting, in part: I dissent from so much of the opinion of *Mr. Justice Brown* as decides that any cause of action is shown, either in the pleadings or proof, against defendant. I concur with so much of the opinion as decides that, in any point of view, the defendant could be liable only for actual damages. I have given to the case my most careful and anxious consideration and investigation, because of the divergent views of the Judges and the far-reaching effect of the holding upon the liabilities of all of our citizens in their business and industrial life. The plaintiff, by his allegation and proof, has narrowed the question to its simplest possible form. He has carefully excluded any suggestion of negligence, resting his action upon a willful, wanton tort. In *Loubz v. Hafner,* 12 N. C., 185, *Taylor, C. J.,* said: "For beating a drum on the highway, where a wagon and team are passing, by which the horse takes fright, runs away and damages the wagon, the action is properly brought in trespass."

So it is held that willfully discharging a gun, whereby a sick person is frightened, is an indictable assault. *Com. v. Wing,* 9 Pick., 1, citing *Cole v. Fisher,* 11 Mass., 137. The evidence fully sustains the allegation. The blowing of the whistle, helloing and shouting of the hands was wanton and willful, without any purpose to or having any connection with the discharge of any duty to the plaintiff or the public. One witness swears that the engineer said he did it "to see the horses jump about." His Honor correctly interpreted the complaint, and, therefore, declined to submit an issue in regard to contributory negligence, because it did not arise upon the pleadings. There can be no contributory negligence when the defendant has been guilty of no negligence to which plaintiff's negligence could contribute. "An assault and battery is not negligence." Beach Cont. Neg., sec. 65. The cause of action is the unlawful, wrongful act, resulting in injury—the frightening of the horse; the damage which proximately flowed from the wrong measures the extent of the recovery. The wrongdoer is liable for all damages which proximately flowed from the act. *Ramsbottom v. Railroad,* 138 N. C., 38; *Johnson v. Railroad,* 140 N. C., 574; Hale on Damages, 36-38. Hence the plaintiff's cause of action is the wrongful act of the engineer and other servants, and he recovers for the damage sustained by him in his efforts to control the horses after being frightened, because such damage proximately flowed from the wrongful act. We then have this case: Defendant, for the purpose of hauling logs to its mill, and such other purposes as its business required, owned and operated a "tramroad," located some twenty feet from and running parallel with the public highway. On 20 May, 1903, the plaintiff was passing along the highway, at the point named, not a public crossing, when he met the engine operated by the engineer and several hands, firemen, etc. The highway and tramroad ran parallel some three hundred yards; the engine was that distance from plaintiff when he first saw

it.   His horse and mule were gentle and not afraid of the usual noise of trains; had been around them and were not frightened.    When about seventy-five yards from plaintiff, the engineer began blowing the whistle and continued for about seventy-five yards after passing him, giving short, quick and loud shrieks and blasts.    The hands on the train waved their hats and hands toward plaintiff and "hollowed" very loud.    This conduct was, on the part of the engineer and other servants, willful and wanton and "for the purpose of frightening the horses of the plaintiff," and he was "injured thereby."    This is the case as stated by the plaintiff and found by the jury.    Is the defendant liable for the injury thus sustained by plaintiff, and if so, is it liable for punitive or vindictive damages?    The engineer and the other persons engaged in the conduct described are criminally liable, and in a civil action may be held to compensatory and vindictive damages.    The natural indignation aroused by a recital of their conduct, in the light of the gross, wanton wrong done plaintiff, must not be permitted to disturb our judgment in inquiring into the liability of the defendant.    There is no suggestion, otherwise than is shown by their conduct on this occasion, that the servants employed by defendant to conduct its legitimate business were unfit persons.    There is no negligence alleged or shown in regard to their selection for the business for which they were employed; nor is there any suggestion that the tramroad was negligently placed, so that, in the proper and careful operation of the engine, the horses of the plaintiff or other persons would have been frightened. The plaintiff says: "The mule and horse were both gentle and not afraid of the usual noises of the train."    This·case is clearly distinguished from *Daniel v. Railroad,* 117 N. C., 592.    There the liability of the defendant was based upon the fact that, at the time of the shooting by the station agent, plaintiff's intestate was a passenger.    The principle upon which that case is decided is uniformly recognized and en-

forced. A full note, with the citation of many decided cases, may be found in 4 L. R. A., N. S., 485, where *Daniel's case* is reported. I also concur in the principle upon which this Court sustained a recovery in *Pierce v. Railroad,* 124 N. C., 83, and *Cook v. Railroad,* 128 N. C., 333 ; *Hayes v. Railroad,* 141 N. C., 95. All of these and similar cases rest upon the fact that, in ejecting persons wrongfully on the cars, the servant, in the discharge of his duty, used excessive force. It was held in those cases that the fact that defendant's servant acted wantonly and willfully was immaterial. I have no purpose to call into question the decision in either of these cases. There are but two cases in our reports which in the slightest degree militate against the conclusion reached by me in this case. I will refer to them later.

The principle involved in the case differs in no respect from one in which a farmer, owning a threshing machine attached to a portable engine, operated by his servants, by the side of a public highway, finds himself sued for damages because his servant, for some purpose of his own, either wantonly or maliciously, blows the whistle or makes some other noise of which the machine is capable, but not necessary in its operation, whereby some person passing along the highway is injured. Nor can I see any difference in principle between this case and one in which a person owning and operating a steam cotton gin near the roadside, whose servant, for some purpose of his own, and not to manage or control the movement of the gin, blows the whistle and frightens a horse. In neither case is there any negligence. Formerly it was held that a master was not liable for the tort of his servant, although committed in the scope of his employment, when the tortious act was wanton or willful. *Campbell v. Staiert,* 6 N. C., 389 ; *Harris v. Mabry,* 23 N. C., 240. These and many other cases decided in other jurisdictions follow the decision in *McManus v. Crickett,* 1 East., 105 ; *Wright v. Wilcox,* 19 Wend., 343 ; *Vanderbilt v. Richmond Turnpike Co.,* 2 N. Y.,

479.    This view has been abandoned by the courts, both in England and in this country, and it is now generally held that the test of liability is not whether the wrong is willful, wanton or malicious, but whether it is done in the scope of the employment.    This Court, without expressly overruling the earlier cases, has adopted the modern view.    It is said in Pollock on Torts (7th Ed.), 91: "A master may be liable for willful and deliberate wrongs committed by the servant, provided they be done on the master's account and for his purposes; and this, no less than in other cases, although the servant's conduct is of a kind actually forbidden by the master. Sometimes it has been said that a master is not liable for the 'willful and malicious' wrong of his servant.    If 'malicious' means committed exclusively for the servant's private end, or 'malice' means private spite, this is a correct statement; otherwise it is contrary to modern authority."

It is uniformly held at this time that the test of liability of the master for torts of his servant is whether, at the time he did the act complained of, he was acting within the scope of his employment.    Various theories are advanced by judicial writers and judges as the basis of the doctrine, but all of them concede that none are entirely satisfactory.    If we adopt the maxim *respondeat superior* as the basis, we find ourselves but little advanced in the solution of many cases.    It is very easy to say, let the principal be responsible for the acts of his agent. We are at once confronted with the question, What acts?    The answer is, those which he has employed him to do.    Mr. Jaggard finds the same difficulty when he invokes the maxim *Qui facit per alium facit per se*—a maxim which, he says, "in the law of torts, has created much confusion."    1 Torts, 38.    In many of the cases the liability is based upon the theory that the act which the servant does is commanded by the master, and he is liable for the manner in which the command is executed.    This is illustrated in *Cook's case, supra.* The master imposes the duty upon his servant to eject persons

wrongfully on the train. This the master has a right to do, and if he uses excessive force, or acts from anger, he is liable. When he commands his servant to act, the act of the servant is his act, with all of the legal consequences growing out of the manner of doing it.

Mr. Jaggard says: "If a master assists a servant in an assault, they are actual joint tort feasors. If he commands his servant to assault, they are constructively joint tort feasors. This is also true when he directs his servant to do something which necessarily or naturally involves an assault. But when a servant, contrary to orders and without the knowledge of the master, assaults, for example, the master's customer or the master's passenger, the master is sometimes held responsible, not because the tort is really his, but because of the relationship he bears both to the servant and to the injured man. *If he sustain no relationship to the complainant which imposes on him a duty which his servant violates, there is no responsibility.*" Torts, 39.

As is said by *Mr. Justice Hoke,* in *Sawyer v. Railroad,* 141 N. C., 1, quoting from Wood on Master and Servant, "The question usually presented is whether, as a matter of fact or law, the injury was received under such circumstances that, under the employment, the master can be said to have *authorized* the act; for if he did not, either in fact or law, he cannot be made chargeable with its consequences, because, not having been done under authority from him, express or implied, it can in no sense be said to be his act, and the maxim previously referred to does not apply. The test of liability in all cases depends upon the question whether the injury was committed by the *authority* of the master, *expressly conferred or fairly implied from the nature of the employment and the duties incident to it.*"

*Justice Walker,* in *Daniels v. Railroad,* 136 N. C., 517, puts the principle clearly: "The act of the servant must be something done in attempting to do what the master has em-

ployed the servant to do." If the liability grow out of the idea that the master has commanded his servant to do the thing of which complaint is made, or has commanded him to do something which involves—that is, renders necessary to its accomplishment—the thing complained of, how is the defendant liable for the servant's act in this case? The servants were employed to operate the engine over the tramroad. This was not in itself wrongful or dangerous, unless negligently done. While it is not alleged or proven, we know from observation and experience that engines have attached to them an appliance by the use of which the steam is made to escape in a way to make a loud noise. We know, also, that this appliance is no part of the motive power of the engine; it does not contribute to or regulate its movement, but is intended and used only to give notice of the starting, approaching or stopping of the train, for the various purposes commonly understood. For these purposes it may fairly be supposed the master commands the engineer to use the appliance known as the whistle, and for the manner in which this command is executed the master is liable. We know equally well, and the plaintiff evidently knew, that it was no part of the duty or business of the engineer to blow the whistle, or of the hands to wave their hats and holler to persons passing along the highway, except at certain times and places and for the usual purposes. There was, therefore, no command, either actual or constructive, to do so. Hence the plaintiff truthfully alleged that they did so, not for the purpose of operating the train, but "for the purpose of frightening his horse." Unless, therefore, the master be liable upon some other ground than that of a command or authority to do the act, it cannot be so at all. If he did not command the act, neither the maxim *respondeat superior* nor *qui facit,* etc., applies. It is impossible, upon this theory, to conceive how the master can be liable for an act which he neither actually nor constructively commanded or authorized to be done. It no more com-

manded the act of which plaintiff complains than the farmer who sends his wagon and mules to town by his servant commands the servant to strike a person by whom he is passing. It is inconceivable how one can be said to do, by another, an act which he neither commands nor authorizes another to do.

This brings us to inquire whether the act of the servants was in the scope of their employment. There was no duty resting on the master to sound the whistle or wave hats at the place described. No such duty was either imposed upon or delegated to the servants, and any suggestion that the servants were acting for the master or in the discharge of any duty resting upon it is expressly negatived by the fact that they did it for a purpose of their own—that is, to frighten the plaintiff's horses. All of the authorities concur in the statement that the master is liable for the tort of his servant when committed in the scope of his employment, and is not liable when the act is not within the scope of such employment, or, as said by Jaggard, "is the independent tort of the servant." Torts, 276.

It will be observed that Sir Frederick Pollock, probably the most accurate writer on the subject, is careful to say that, while the master is liable for even willful and deliberate wrongs committed by the servant, "provided they be done on the master's account and for his purposes, sometimes it is said that the master is not liable for willful and malicious wrong of his servant. If 'malicious' means committed exclusively for the servant's private ends, or 'malice' means private spite, this is a correct statement." The law is well stated and frequently formulated as laid down in Smith Master and Servant, 151; 2 Foundations Legal Liability, 470.

*Harrelson, J.*, in *Goodloe v. Railroad*, 107 Ala., 154 (54 Am. St. Rep., 67), says: "What is meant by the words 'while acting within the range of the authority of the employment of the servant' is made the ground for contention in each case.

\* \* \*  It is said, on the point under consideration, that the rule of the responsibility of the master for the acts of his servant does not apply simply from the circumstance that, at the time when the injury is inflicted, the person inflicting it was in the employment of another; but that, in order to make the master liable, the act inflicting the injury must have been done in pursuance of an express or implied authority to do it—that is, it must be an act which is fairly incident to the employment."

In *Railway v. Baum,* 26 Ind., 70, it is said: "It is not to be understood, however, that the master is never liable for the willful and malicious acts of the servant unless he has directed those specific acts to be done.   The rule is not so broad as that.   If the act of the servant complained of was necessary to be done to accomplish the purpose of the servant's employment—if it was essential as a means to attain the end directed by the master and was intended for that purpose— then it was implied in the employment, and the master is liable, though the servant may have executed it willfully and maliciously.   But *when it is unnecessary to the performance* of the master's service, *and not really intended for that purpose,* but is committed by the servant *merely to gratify his own malice,* though under pretense of executing his employment, it is not done to serve the master, and is not, in fact, within the scope of the employment, and the master is, therefore, not liable.   It will not do to say that he shall answer in damages because, by employing the servant, he gives him an opportunity to maltreat those with whom he comes in contact in discharging his duties."

The disastrous results of adopting the reasoning repudiated in the opinion are apparent.   The difficulty experienced by the courts in applying the term "scope of employment," or, as is sometimes said, "course of employment," is illustrated in a large number of cases.

In a well-considered case the Court of Errors of New Jersey, discussing the changes made in the original rule, says: "The rule has been gradually extended until it may be said that the liability of the master now extends to every case when the act of the servant is done with a view to the furtherance and discharge of his master's business and within the scope and limits of his employment. Beyond the scope of his em- ployment the servant is as much a stranger to the master as any third person, and his act in that case cannot be regarded as the act of the master. The rule as it is now established by the later judicial declarations should be strictly held within its defined limits. It is a rule capable of great abuse and much hardship, and the courts should guard against its exten- sion or misapplication." *Holler v. Ross,* 68 N. J. L., 324.

*Lord Holt,* in *Middleton v. Fowler,* 1 Salk (10 Wm. III.), said: "No master is chargeable with the act of his servant but when he acts in execution of the authority given by his master."

In *McManus v. Crickett, supra, Kenyon, C. J.,* said: "Now, when a servant quits sight of the object for which he is employed, and, without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for such acts." It is said by the Reporter "that this cause was very much discussed at the bar, and the Court took time to consider of their judgment." It is said "the modern law largely has its roots" in the words of *Lord Kenyon.*

In *Craft v. Allison,* 6 E. C. L., 528 (4 Barn. & Ald., 590), it is said: "If a servant driving a carriage, in order to effect some purpose of his own, wantonly strikes the horses of an- other person and produces the accident, the master will not be liable. But if, in order to perform his master's orders, he strikes, but injudiciously and in order to extricate himself

from a difficulty, that will be negligent and careless conduct, for which the master will be liable, being an act done in pursuance of the servant's employment."

*Creswell, J.,* in *Mitchell v. Crasweller,* 13 C. B., 76 (E. C. L., 257), said: "No doubt, if a servant, in executing the orders, express or implied, of his master, does it in a negligent, improper and roundabout manner, the master may be liable. But here the man was doing something which he knew to be contrary to his duty and a violation of the trust reposed in him. I think that it would be a hardship upon the employers to hold them to be responsible under such circumstances." The case of *Limpus v. Lon. Omnibus Co.,* L. J., 1863 (N. S., 32, 35), is regarded as the controlling authority on the subject. All of the Judges wrote opinions. *Williams, J.,* said: "If a master employs a servant to drive and manage a carriage, the master is, in my opinion, answerable for any misconduct of the servant in driving or managing it which can fairly be considered to have resulted from the performance of the functions entrusted to him, and especially if he was acting for his master's benefit and not for any purpose of furthering his own interest, or for any motive of his own caprice or inclination."

In *Poulton v. Railway Co.,* L. R., 1866 (2 Q. B. D., 534), the English cases were reviewed, *Blackburn, J.,* saying: "Then comes the question we have to determine, Can there be said to be any evidence from which it may be inferred that the railway company authorized the station master to do an act which, it appears on every view of the facts, he would be utterly unauthorized to do? We think not. We do not think it is within the scope of his authority, in what he was authorized to do, to bind the company. It was an act out of the scope of his authority, and for which the company would be no more responsible than if he had committed an assault or done any other act which the company never authorized

him to do." The case of *Gaff v. Railway Co.,* 30 L. J. Q. B., 148 (107 E. C. L.); *Seymour v. Greenwood,* 30 L. J. Ex., 328 (7 H. & N., 358), and the *Limpus case, supra,* are noted and distinguished, saying: "If the station master had made a mistake in committing an act which he was authorized to do, I think, in that case, the company would be liable, because it would be supposed to be done by their authority." To the same effect are the American authorities.

In *Cosgrove v. Ogden,* 49 N. Y., 255, it is said: "If the servant (entrusted with removing timber from the roof of a house) *for some purpose of his own* intentionally threw material upon a passenger, the master would not be responsible for the injury, because it would not be an act done in his business, but a departure therefrom by the servant to effect some purpose of his own."

In *Rounds v. Del., Lack. & W. Railroad,* 64 N. Y., 129, *Andrews, J.,* says: "It seems to be clear enough, from the cases in this State, that the act of the servant causing actionable injury to a third person does not subject the master to civil responsibility in all cases where it appears that the servant was at the time in the use of his master's property, or because the act, in some general sense, was done while he was doing his master's business. On the other hand, the master is not exempt from responsibility in all cases on showing that the servant, without express authority, designed to do the act or the injury complained of. * * * If, however, the servant, under the guise and cover of executing his master's orders and exercising the authority conferred upon him, willfully and designedly, *for the purpose of accomplishing his own independent, malicious or wicked purposes,* does an injury to another, the master is not liable. The relation of master and servant, as to that transaction, does not exist between them." To the same effect are *Mott v. Ice Co.,* 73 N. Y., 543; *Ochsinbein v. Shapley,* 85 N. Y., 214. *Smith v.*

*N. Y. Cent., etc., Railroad,* 78 Hun., 524, is an instructive case on this subject.    Plaintiff was standing on the platform; a local freight stopped and switched some cars, and was about to start, when Riker, defendant's station agent, stepped out and placed two torpedoes on the track, under one of the freight cars, and then ran back into the station house.    The train moved off; the torpedoes exploded, causing a sharp fragment to strike and injure the plaintiff.    The agent testified that he placed the torpedoes on the track to hear the explosion and with no object of signaling the train, the purpose for which the torpedoes were furnished.    *Haight, J.,* said that the only question was whether the agent, in placing the torpedoes on the track, was acting within the scope of his employment, in the performance of a duty imposed upon him by the company.    "If so, it was negligent and dangerous to explode the torpedoes in the vicinity of the station, where persons were standing upon the platform, and the company is liable; but if, by doing what he did, he went outside of his employment in order to effect a purpose of his own in exploding the torpedoes for his own amusement, and not for the purpose of signaling the train, then the company would not be liable."

The leading case in Massachusetts is *Howe v. Newmarch,* 94 Mass., 49.    *Hoar, J.,* in a well-considered opinion, reviews the English and American authorities, and says: "In an action of tort, in the nature of an action on the case, the master is not responsible if the wrong done by the servant is done without his authority and not for the purpose of executing his orders or doing his work.    So that, if the servant, wholly for a purpose of his own, disregarding the object for which he is employed, and not intending by his act to execute it, does an injury to another, not within the scope of his employment, the master is not liable.    But if the act be done in the execution of the authority given by his master, and for the purpose of performing what the master has directed, the master will be responsible, whether the wrong be occasioned by

146—7

negligence or by a wanton or reckless purpose to accomplish the master's business in an unlawful manner."

In *Brown v. Jarvis Eng. Co.,* 166 Mass., 75, *Lothrop, J.,* says: "The act of defendant's servant was not a necessary or natural or proper result of anything that the servants were employed to do." *Obertoni v. B. & M. Railroad,* 186 Mass., 481.

In *Berry v. Boston El. Railway,* 188 Mass., 536, referring to the act complained of, the Court says: "The boys were well known to the conductor, and it was apparent from the evidence that the conductor was playing a practical joke on the policeman." Held, that defendant company was not liable.

In *Cobb v. Simon,* 119 Wis., 597 (100 Am. St. Rep., 909), the master was held not liable for wrongful arrest of a person by his clerk, who knew that no goods had been stolen, but made the arrest for the purpose of extorting money from the plaintiff. In *Railway Co. v. Brown,* 26 Ind., 70, the authorities are reviewed and the general principles clearly set forth.

In *Cousins v. Railroad,* 66 Mo., 572, it is said: "Two classes of cases have arisen under the rule now being considered, in which the master is not liable for the acts of his servant. The first is when the servant was, at the time the injury was inflicted, engaged in the performance of the service which he was engaged to render, but the act which occasioned the injury did not pertain to the particular duties of the employment. Thus, if an engineer, while running a train, should shoot an unoffending man upon the roadside, the injury would be inflicted while the engineer was engaged in serving his master, but the act causing the injury would have no connection with that service and could not be considered as done in the course of the servant's employment."

*Alvey, C. J.,* in *Fletcher v. Railway Co.,* 6 Dist. Col. App. Cases, 385, p. 397, says: "The person who threw off the piece of wood that injured plaintiff was not in the performance of any duty required of him, but his act was wholly independent

of any duty imposed upon him by his employment to work for defendant. In other words, his act was not one within any limit or scope of authority derived from the defendant as agent or servant in the performance of duty."

In *Stephenson v. Railroad,* 93 Cal., 558, the action was for injuries sustained by the action of the engineer in moving his engine with the intent to frighten the passengers on a street car. *DeHaven, J.,* said: "The engineer was not acting within the scope of his employment if his object in moving the engine was simply to frighten the passengers in the street car. Such an act, done for such a purpose, was entirely foreign to the object of his employment. The work which the engineer was to perform for defendant was to manage the engine while it was engaged in switching cars; and if he started the engine, not for the purpose of employing it in the service of the defendant, but to accomplish an independent purpose of his own, ＊ ＊ ＊ it is immaterial that he used the engine of the defendant in order to accomplish his purpose." By way of illustration, he says: "It would not be contended that one who employs another to sprinkle his garden and places in his hands a hose to be used for that purpose would be civilly responsible in damages if, stepping aside from that employment, the servant should, either in sport or from malice, turn the same upon a person passing along the street. ＊ ＊ ＊ In all the affairs of life men are constantly obliged to act by others; but no one would venture to so act if the mere circumstance that he employed another to act for him about any general or particular business made him an insurer against all wrongs which such persons might possibly commit during the period of such employment." The distinction is clearly stated in *Little Miami Railroad v. Wetmore,* 19 Ohio St., 110. The action was for an assault committed by the servant. The Court said: "The assault was in no way calculated to facilitate or promote the business for which the servant was employed by the master, nor could it have been supposed to be

or intended as an act with that view or object. It is not a case of excess of force and violence in executing the authority of the master, but rather an act beyond such authority or foreign to the objects of the employment." *Gilliam v. Railroad,* 70 Ala., 268.

In *Louisville & N. Railroad v. Roult,* 76 S. W., 513, the Supreme Court of Kentucky held that the company is not liable for the act of a locomotive fireman in purposely throwing a piece of coal at one standing beside the track, not with any purpose of protecting the master's property or furthering "its interest."

In *International & G. N. R. Co. v. Cooper,* 32 S. W., 517, the Court says: "The distinction is this: That, if the act done was one authorized to be done by the servants, and was at the time being done in the discharge of their duty as such servants, then the master would be responsible for the consequences to the plaintiff, although the servants might, in the discharge of their duty, maliciously or mischievously have thrown the water upon the plaintiff. It cannot be said that the act of putting the water upon the plaintiff must have been authorized, because such an act would never be authorized by a master; but it is the act itself of discharging the hot water that must have been done in the course of the employment of the servant and for the purpose of forwarding the business of the master. It does not matter that the servant might have used the same appliances in the discharge of a duty to the master, but the question definitely and distinctly presented is, Was the servant, in the particular case, in the discharge of such duty?"

The last case from which we quote is *Evers v. Krouse,* 70 N. J. L., 653. There the infant son of defendant was directed to sprinkle water on the lawn in front of the house. While engaged in this work, plaintiff left a horse tied near by. The boy turned the hose on the horse, so frightening it that it ran away and was killed. In an action for damages against the

father, he took an exception to the instruction that he would be liable if the boy, "through a mischievous disposition, threw the water upon or over the horse." *Gummere, C. J.,* wrote an interesting opinion for the unanimous Court of Errors and Appeals sustaining the exception. Referring to the case of *Holler v. Ross, supra,* he said that, while the rule laid down in that case had been followed in other jurisdictions, there had been much contrariety in its application. "This is due to the assumption in some courts that an act done by a servant while engaged in the master's work is necessarily an act within the scope of the former's employment. But this is conspicuously a *non sequitur.* An act done by the servant while engaged in the work of his master may be entirely disconnected therefrom, not as a means or for the purpose of performing that work, but solely for the accomplishment of the independent, malicious, mischievous purpose of the servant. Such an act is not, as a matter of fact, the act of the master, in any sense, and should not be deemed to be so as a matter of law." The learned Justice notes the distinction between that case and *Bittle v. Railway,* 55 N. J. L., 615. In the last-named case the statute required the company to blow 300 yards distant from a highway crossing. The evidence showed that the engineer saw that plaintiff's horse had become frightened at the approach of the train, when he wantonly and maliciously blew an extraordinarily loud and shrill blast from the whistle. The company was held liable, *because it was the duty of the engineer to blow the whistle at that point.* It was within the scope of his employment, and because of that fact the rule of *respondeat superior* applied. The question has been before almost every court in this country, and, with a very few exceptions, decisions have been in harmony with those from which I have quoted. *Turley v. Railroad,* 70 N. H., 348; *Railway v. Little,* 67 Ohio St., 71; *Healy v. Patterson,* 123 Iowa, 73; *Railway Co. v. West,* 125 Ill., 320; *Slater v. Thresher Co.,* 5 L. R. A., N. S., 598; *Smith v. Railway Co.,*

95 Ky., 11 (22 L. R. A., 72); *Porter v. Railroad,* 41 Iowa, 358; *Ch. & N. W. Railway v. Bayfield,* 37 Mich., 205; *Palmer v. Elec. Co.,* 131 N. C., 250.

In *Daniel v. Railroad, supra,* and *Sawyer v. Railroad, supra,* this Court applied the principle upon which we have decided this case. In *Jackson v. Tel. Co.,* 139 N. C., 347, the master was held liable upon the same principle. *Brendle's case* is noted in *Foot v. Railroad,* 142 N. C., 52, but the question presented here was not involved. Mr. Jaggard says that the English courts, at an early period, recognized the doctrine of a particular command in the test of liability; hence the maxim *respondeat superior* was usually invoked. By the modern view the test is generally held to be the scope of employment; but when we reason back to the principle, we find that, as said by many courts and writers, the basis in either view is the same—the master commands the servant to do the particular thing, and, by construction, such other things as are necessary to execute the command, such things being thereby brought within the scope of the employment. For the manner of doing the thing commanded to be done, including such things as are involved therein, the master is liable. When we use the term "command" we do not overlook the fact that the failure to obey instructions in the manner of executing the command does not absolve the master. If the servant keep within the scope of his employment, and, with the purpose of discharging his duty to his employer, depart from the orders given, or wantonly and willfully injure another in doing his master's business, the master is liable. In many cases the extent of deviation from the orders of the master which will absolve him is presented. No such question arises here, and I simply refer to these phases of the question for the purpose of excluding the suggestion that I have overlooked them. It is said that in *Everett v. Railroad,* 121 N. C., 521; *same case,* 122 N. C., 1010, and *Brendle v. Railroad,* 125 N. C., 474, the defendant was held liable upon

an allegation and proof similar to that made in this case. We have examined the original record in these cases. In *Everett's case* the complaint discloses an action for negligence, pure and simple. The allegation is that defendant's servants "willfully, maliciously, *negligently* and unnecessarily" blew the whistle, etc., and *"did frighten the plaintiff's horses,"* etc. The issue was in the usual form: "Were the plaintiff's horses injured by defendant's negligence, as alleged?" The question under discussion was not raised or suggested, except in an instruction asked by the defendant: "Unless the jury believes that the person who blew the whistle blew it wantonly or maliciously, for the purpose of frightening the horses, he is not entitled to recover." The instruction was refused. The Court instructed the jury that, if the servant blew the whistle *negligently,* for the purpose of frightening the horses, the defendant was liable. It is evident, from the record and the language of the Court, that the question was not raised or considered respecting the "scope of employment." The petition to rehear raises no such question. In *Brendle's case* the complaint was in the same language, the action being for the injury to the driver upon the same occasion. It is true that the issue there contained the words "for the purpose of frightening the horses," etc., but there was no such allegation. Both were actions for negligence, and not for assault. Neither Court nor counsel, nor does this Court, consider the question presented here. The case is simply referred to in *Foot v. Railroad,* 142 N. C., 52, and not commented upon. I do not think that, in view of the facts appearing in the record, the cases can be regarded as establishing the principle that a master is liable for the tort of his servant, committed while on duty, but for his own purpose and not in furtherance of his employment. In this case there is no suggestion that the defendant was negligent in the placing of its tramroad, the construction or condition of its engine, the employment of or instruction to its servants, or that it in any way ratified or

approved the conduct of its servants. To hold it liable simply because it employed servants who departed from their duty, without any regard to the purpose of their employment and for a purpose of their own, wantonly and willfully diverted the instrumentality furnished for a legitimate use to the injury of the plaintiff, is, I respectfully submit, doing violence to the principles of both natural justice and sound law. Undoubtedly, persons—natural or corporate—should be required to exercise due care, to be measured by the peril to others, in entrusting dangerous instrumentalities in the hands of their servants, and it is but just to hold them liable for a breach of duty in that respect; but, in the absence of any suggestion of want of such care, "it would be a hardship on the employers to hold them liable" for acts committed outside the scope of the employment.

The basis upon which the master is held liable for the acts of his servant is restated by the editor, in an exhaustive discussion of the subject, in 26 Cyc., 1518: "The master may be liable for the acts of his servant on either of the following grounds: (1) Negligence of the master in selecting his servants or instructing them as to the duties of their position; (2) an express demand to the servant to do the act resulting in the injury to the third person; (3) acquiescence in or assent to former like acts of the servant or to the act in question; (4) the fact that the act of the servant was within the scope of his employment and in the line of his duties while engaged in such employment; and (5) ratification by the master of the act of the servant causing the injury to the third person." It is manifest that this case does not come within either of the above classes.

It is strongly insisted, however, that, because of the dangerous instrumentality used, and the manner and place of its use, the owner is held to insure that persons passing along the highway shall not suffer any injury. This duty, if it rest upon the defendant, removes the case from the domain of neg-

ligence and of the law regarding the liability of the master for the acts of his servant. It falls within the class known as absolute duties, and is based upon the maxim, *sic utere tuo alienum non leadas*. If the instrumentality in the manner and place of its use comes within the principle involved in the maxim, no question of care, either in regard to the selection of the servant or his conduct, can arise. It is the fact of sending the engine upon his premises, near the highway, resulting in injury to the plaintiff, which makes him liable. No amount of care or caution relieves the owner of liability in the use of such instrumentalities. If the engine used, as described by plaintiff, is so essentially dangerous that, in contemplation of law, any damage flowing from its operation is actionable, although the complaint is drawn upon an entirely different theory, the plaintiff is entitled to at least actual damages.

The principle is thus stated by Pollock: "The law takes notice that certain things are a source of extraordinary risk, and a man who exposes his neighbor to such risk is held, although his act is not of itself wrongful, to insure his neighbor against any consequent wrong not due to some cause beyond human foresight and control." The learned and accurate author says: "A rule casting the responsibility of an insurer on innocent persons is a hard, though it may be a just one, and it needs to be maintained by very strong evidence or very clear grounds of policy. * * * The liability seems to be rested only in part on the evidently hazardous character of the state of things artificially maintained by the defendants on their land. In part, the case is assimilated to that of a nuisance." Torts, 480. The principle, in its application, is illustrated in a large number of cases in the reports. The case of *Rylands v. Fletcher,* L. R., 3 (H. L., 330), has been very much modified, both in this country and in England. In this State the liability for setting fire to adjacent buildings or woods by the engines of railroad and lumber companies is confined to negligence, either in the construction or opera-

tion of the engine or of the condition of the right of way. *Anderson v. Steamboat Co.,* 64 N. C., 399; *Aycock v. Railroad,* 89 N. C., 321; *Craft v. Lumber Co.,* 132 N. C., 151; *Simpson v. Lumber Co.,* 133 N. C., 95; *Knott v. Railroad,* 142 N. C., 238.

In *Thomason v. Railroad,* 142 N. C., 300, the liability for injuries sustained by an adjacent owner and resident by noises, smoke, cinders, etc., in the operation of steam engines, is made to depend upon an allegation and proof of negligence; and in plaintiff's appeal (p. 318) a demurrer was sustained because it was not alleged that the injury was caused by a negligent use of the engines. For killing stock the liability is dependent upon negligence. I should hesitate to hold that a steam engine operated over a tramway near to a highway for hauling logs, or stationary for ginning cotton or sawing lumber, or for any of the numerous lawful uses to which it is applied, is, in the absence of negligent construction, condition or use, within the principle fixing liability upon the owner as an insurer.

In *Losee v. Buchanan,* 51 N. Y., 416, the action was for the recovery of damages caused by the explosion of a boiler attached to a steam engine operated by defendants, throwing parts of the iron on plaintiff's premises and building, injuring his property. The plaintiff contended that, in the absence of negligence, defendant was liable for a trespass. *Earl, J.,* reviewed the authorities, including *Rylands v. Fletcher,* concluding an able opinion: "In this case the defendants had the right to place the steam boiler upon their premises. It was in no sense a nuisance, and the jury have found that they were not guilty of any negligence."

In *Wabash & St. L. Ry. v. Farver,* 111 Ind., 195, *Mitchell, J.,* discussing the liability for damages caused by frightening a horse by the operation of a portable engine near the highway, says: "The work contracted to be done was not in itself unlawful, nor was it necessarily a nuisance to operate a porta-

STEWART *v.* LUMBER CO.

ble steam engine in a careful manner in close proximity to a public highway."

The same is held in a very strong opinion by *Cooley, C. J.,* in *Macomber v. Nichols,* 34 Mich., 212. *Judge Thompson,* after discussing the question, concludes: "The sound view would seem to be that such an engine, as a means of locomotion, is not necessarily a nuisance, and the question whether its use as such has in a particular instance been so negligently managed to the injury of others as to give rise to a right of action is one of fact for the jury as a question of reasonable conduct and management." 1 Neg., 1312. It would be difficult to distinguish this case from one in which sparks are emitted, setting fire to woods or buildings, or where noises, smoke, etc., injure persons and property. Why would it not follow, applying the maxim, *sic utere,* etc., that any blowing of the whistle, whether excessive or otherwise, or any other noise made by the engine by which a horse passing along the highway is frightened, gives a cause of action? Certainly, if the same rule of liability be imposed as in the case of dangerous animals escaping from one's premises, the doctrine must be carried to its logical results or the law made to adjust itself to each case as it comes before the courts. No matter how perfect the machine, how competent and careful the engineer, the instrumentality on or near the highway being under the ban of the law, all injuries caused by its use are actionable. The principle, within proper limitations, is sound and just. If I wish to keep a dangerous or vicious animal on my premises, it is but just that I should pay for any damage which my neighbor sustains by its escaping and going upon his premises, or to one passing along the highway. If, however, I wish to gin my cotton, bale my hay or saw the timber on my land into boards, or haul my logs to the mill, and for either of these purposes use a steam engine, it has heretofore been supposed that my duty to my neighbor and the public was met by a proper placing, construction, selection of my servants and

careful operation of the engine—that for a breach of duty in
either of these respects I am liable—in the first case, as an
insurer for any damage which my animal does; in the last I
am liable for negligence, either on my own part or of my ser-
vants, and for torts committed by them within the scope of
their employment. It may be that the defendant's tramway
was negligently placed so that *any* blowing of the whistle
would have frightened the horses of persons passing the high-
way, or that it did not exercise due care in selecting its engi-
neer; but none of these things are alleged. As the case goes
back for a new trial, it is within the discretion of the Court to
permit amendments to the complaint presenting these or any
of these questions which would be for the jury. I am of the
opinion that, in the present condition of the pleadings, the
defendant is not liable, no negligence being alleged or shown.
I am not able to say, as a matter of law, that the engine, as
operated, was so essentially dangerous as to impose upon the
owner the absolute duty of insurance against all damage.
Much that is said upon the principal question assumes that
the term "while in the employment" is synonymous with "in
the scope or course of the employment." The line is not
always easy to draw, yet, if not drawn, the employer is made
responsible for every tort committed by the employee *during
the time of his employment.* No one has ever so contended,
and certainly no court has ever so held. I have examined
many of the authorities relied upon to maintain the liability
of defendant. Many of them are actions for negligence in
blowing the whistle, and all of them assume that the injurious
act is done in the scope of the employment. In some of the
cases there is a manifest confusion of expression and thought
upon the subject, and an evident desire to confine the de-
parture from principle and precedent to railroad companies.
If conditions be such that the law should be so made, it would
be much better for the Legislature to do so, defining clearly
its limitations. I must confess that I am unable to see where

the Court is to fix the line of responsibility when it departs from the principle and authority. My acquaintance with and observation of the character and conduct of locomotive engineers—men into whose care and to whose skill, courage and fidelity we daily commit our own and the lives of our families, to say nothing of property—do not impress upon my mind the necessity for departing from the ancient landmarks and making exceptions to the universal principles of law. It is hardly probable, and the records of the courts do not show, that these men who, with heroic courage, wonderful skill and almost uniform fidelity, expose their lives driving these locomotives through the country by day and through the darkness, will wantonly, willfully and maliciously use steam whistles for the purpose of destroying life and property. They may do so negligently, and for this it is but just that their employers should be responsible. The relative rights and duties growing out of the relation of principal and agent, master and servant, employer and employee, both as between the parties and third persons, in the complex business of modern life, are of the utmost importance.

I do not suppose that in the application of the general principle any distinction is to be made between natural persons and corporations. In *Railroad Co. v. Baum, supra,* it is said: "Nor will sound policy maintain the application of a rule of law to railways or corporations on this subject which shall not be alike applied to others, as has been intimated in some quarters." All of the courts recognize this principle. It can be of no concern to us whether the stockholders of the defendant are operating as a corporation or a partnership, or, for that matter, each individual conducting the business separately. In either case the necessity for employing servants is the same. The defendant insisted, and introduced evidence tending to show, that the whistle was blown and the other noises made because they were approaching a crossing, and that no more noise was made than was necessary for that pur-

pose.  This contention was properly presented to the jury. They found against it.

The defendant requested the Court to instruct the jury that, in the absence of any evidence tending to show a command or ratification of the act of its servants, they were not authorized to award punitive or vindictive damages.  This the Court declined, and instructed the jury that, if they answered the first issue "Yes," they could, in their discretion, give the plaintiff such damages.  This Court has frequently held that, for assaults committed by the employees of a railroad upon passengers, the jury could, if they found wanton, malicious or even excessive force used, give punitive or vindictive damages.  *Holmes v. Railroad,* 94 N. C., 318; *Kelly v. Traction Co.,* 132 N. C., 368, and many other cases.  To what extent these decisions, and those to the same effect in other States, are applicable to a case like this may be open to discussion.  The general rule may be found in 3 Joyce on Damages, 2034: "In order to recover punitive damages against a master for the wrongful, negligent or grossly negligent acts of his servant, such acts must have been authorized, affirmed or ratified by the master, or they must have been done in the line of the servant's duty or employment, or the master must have known of the servant's unfitness; and if the servant's acts are wanton, willful or malicious, the master is liable for exemplary damages, if such acts are authorized, directed or ratified by him or the latter was implicated therein or instigated the same, or they were done for the master in the line of the servant's duty, or were generally within the scope of his authority."  This language quoted does not appear to me very clear.  Of course, if the wrongful act is wanton, willful, etc., and if expressly commanded or authorized or ratified, it becomes the act of the master in fact, and there can be no question of his liability to the same extent as the servant; they are joint tort feasors.  But if the liability attaches by reason of the doctrine of representation

as a matter of law—that is, because within the scope of employment—a much more serious question arises. One may direct his servant to perform an act, giving express command respecting the manner of its performance, carefully warning him against negligence. If, in doing the act, obeying his command in that respect, but in utter disregard of his directions and caution, he, by wanton, willful negligence, injure another, the master is liable for at least compensatory damages. Is he liable for vindictive damages?

The Supreme Court of Tennessee, in *Railway Co. v. Starnes,* 56 Tenn., 52, held the company liable for the conduct of the engineer, and, in passing upon the exception to the instruction given the jury in regard to exemplary damages, said: "But this is not a case, we think, in which exemplary damages can be allowed. The act complained of was manifestly done without defendant's knowledge or consent, and was the willful and unauthorized act of the servant alone. If the action had been against the actual tort feasor, the rule would be otherwise." This language opens up the original question of liability for the act of the servant. If the act was "unauthorized," how did any liability attach? There is much confusion of language in the decisions growing out of the extension of the liability of the master for wanton, willful torts of the servant. Doubtless the Court, in the cases cited, hesitated to carry the doctrine of liability to its logical conclusion. The question is discussed in an extensive note to *Crane v. Bennett,* 101 Am. St. Rep., 722. The line of distinction between the cases in which the master's liability for punitive damages is coextensive with the servant's, and those in which it is confined to compensatory damages, has not been drawn.

WALKER, J., dissenting: I concur in the opinion of *Justice Connor.* It seems to me that a master cannot be liable for the malicious tort of his servant, committed, not in the line of his duty nor within the scope of the authority which is conferred

upon him by the master, but of his own head and imagination and prompted solely by his own vicious disposition. As we said in *Daniel v. Railroad*, 136 N. C., 522, which is cited with approval by our brethren who differ with us, "It is not intended to assert that a principal cannot be held responsible for the willful or malicious acts of the agent, when done within the scope of his authority, but that he is not liable for such acts unless previously and expressly authorized or subsequently ratified, when they are done outside of the course of the agent's employment and beyond the scope of his authority, as when the agent steps aside from the duties assigned to him by the principal to gratify some personal animosity or to give vent to some private feeling of his own (*McManus v. Crickett*, 1 East, 106); and, as is forcibly stated by *Lord Kenyon* in the case cited, quoting in part from *Lord Holt*, 'No master is chargeable with the acts of his servant but when he acts in the execution of the authority given him.' Now, when a servant quits sight of the object for which he is employed, and, without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for his acts." What better authority can we invoke in support of our position than the opinions of the Court of King's Bench, as delivered by *Lord Holt* and *Lord Kenyon*. But this Court has gone very far, though not by any means to the verge, in sustaining what I conceive to be the only just and safe rule in cases of this kind. The principle announced (in the case to which I refer) by the present Chief Justice, speaking for the Court, is this: That a master is not responsible for any illegal action taken or directed by his servant which he did not advise, consent to or participate in, and which was not justified by any authority he had given. *Moore v. Cohen*, 128 N. C., 345. I quote almost literally from the opinion, and certainly the substance of what was decided is given. Numerous authori-

ties are cited for this position as fully settling the principle. *Ferguson v. Terry,* 40 Ky. (1 B. Mon.), 96; *Welsh v. Cochrane,* 63 N. Y., 181; *Brown v. Kindall,* 90 Mass. (8 Alto), 209; *Fire Association v. Fleming,* 78 Ga., 733, and Cooley on Torts, 131. In that case (*Moore v. Cohen*) an attorney who had been employed to collect a claim undertook, in good faith, to have the defendant arrested upon the ground of fraud committed in contracting the debt, without any express authority of his principal or any subsequent ratification by him. That would appear to be more nearly within the scope of the attorney's authority than the malicious and wanton act of the engineer in blowing the whistle of his engine for no other purpose than to frighten the horses on the public highway and, as a necessary consequence, injuring the plaintiff, was within the scope of his employment, and yet the Court held, in *Moore v. Cohen,* that the principal was not liable for his attorney's unwarranted act. As said by *Justice Blackburn,* in discussing a somewhat similar tortious act, when it was attempted to charge the master with liability, there is no difference, and can be none, between a railroad company, which is a corporation, and an individual. The principle must apply to every class of employment, and every merchant will be responsible for a similar act of his agent and every person for the act of his butler or coachman. To pursue this idea further, the former will be mulcted in heavy damages for the willful and malicious act of his employee or laborer who is in charge of stationary or portable machines, or of implements just as liable to frighten an animal as a steam engine operated by steam; the owner of an automobile for a similar act of his chauffeur, and so on, indefinitely. We cannot coin a principle and restrict it to special cases if it is in its very nature inherently applicable to all other cases of a similar kind, for then we must extend it to them and thus carry it by logical sequence to its natural result. When we stop short of so applying it because of any hardship which

146—8

may ensue in the particular case, we virtually admit its unsoundness, for a just and correct legal principle should naturally and consistently apply to all cases which may legitimately come within its reach. The true doctrine is well stated in *Ferguson v. Terry,* 40 Ky., 96, as follows: No one is liable for trespasses committed by others in his employ unless he gives previous authority or command to do the tortious act, or afterwards assents thereto, or it is done in the discharge of the business which the agent was appointed to do. In the last two cases the law will imply authority to do the unlawful act. See *Daniel v. Railroad,* 136 N. C., 517; *Jackson v. Tel. Co.,* 139 N. C., 347.

In *Roberts v. Railroad,* 143 N. C., 176, *Justice Hoke,* quoting from Wood on Master and Servant, sec. 307, and approving what is said therein, and also what is decided in *Sawyer v. Railroad,* 142 N. C., 1, to the same effect, thus states the doctrine: "The simple test is whether they were acts within the scope of his employment—not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may be fairly said to be authorized by him. By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and written orders. An employer who leaves to an employee to do certain acts for him according to the employee's judgment and discretion is answerable for the manner or occasion of doing it, provided it is done *bona fide* and within the scope of the servant's express or implied authority, *and not from mere caprice or wantonness and wholly outside of the duties conferred upon him.*" (Italics mine). And again, in the same case, at page 180, quoting and approving what is said in *Mott v. Ice Co.,* 73 N. Y., 543, he says: "For the acts of a servant, in the general scope of his employment, while engaged in his master's busi-

ness, and done with a view to the furtherance of that business
and the master's interests, the latter is responsible, whether
the act be done negligently, wantonly or even willfully.    The
quality of the act does not excuse.    *But if the employee, with-
out regard to his service, or to accomplish some purpose of his
own, act maliciously or wantonly, the employer is not respon-
sible."*    (Italics mine).    He then adds: "The general doc-
trine on the subject is fully considered in the case of *Daniel v.
Railroad,* 136 N. C., 527," which case and *Jackson v. Tel.
Co.,* 139 N. C., 347, were approved in *Sawyer v. Railroad,*
142 N. C., at p. 8.    I think the case of *Sawyer v. Railroad,
supra,* is also, in principle, clearly in conflict with the doc-
trine now about to be announced.

*Justice Connor* has so lucidly and fully explained the dis-
tinguishing characteristics of the principles in the law of
torts which determine the liability or nonliability of the mas-
ter for the acts of his servant that discussion is rendered use-
less.    I could not, though, be silent when the Court is estab-
lishing a precedent which, in my judgment, is calculated not
only to extend the liability of the principal for the act of his
agent, and the master for the act of his servant, far beyond
the settled principle of the law relating to that question, but
to seriously embarrass and hamper the business transactions
of the merchant, the farmer and every person who, in his
ordinary affairs, must employ agents or servants to assist him.
My apprehensions will be fully justified if the doctrine thus
settled by the decision in this case is hereafter logically and
fairly applied, as it should be, to all cases of a like kind com-
ing within its scope.

When we charge the defendant with liability, upon the facts
stated in this record, for the reason that it, a lumber com-
pany, is using its track and appurtenances for its own pur-
poses, even if it had carried passengers or freight for accom-
modation, we are going a long way towards unsettling the
foundation upon which the law of torts has rested for so long

a time; and I view this radical departure from the cardinal principle of that law, not only with apprehension, as I have said, but with alarm.    We must sooner or later abrogate or greatly modify the rule as thus formulated, or the business of this State, which is largely conducted through agents and servants, must be seriously hindered, to say the least.    This Court cannot well afford to state a principle of law as applicable to the ordinary and everyday affairs of our people, and then refuse to give it the full scope to which it is entitled when it may be found to operate oppressively.    It must be remembered that we are making precedents for all time to come, and not merely deciding cases.

As I do not think the plaintiff should recover at all, I must, of course, agree with *Justices Connor* and *Brown* that he cannot in any event be awarded vindictive damages.

PER CURIAM: Three Justices concurring in the opinion of *Justice Brown* upon each issue, it becomes the opinion of the Court, and a new trial is ordered upon the second issue, relating to damages.